## In re MAGRILL.

### DOROUGH v. GEORGE W. MILES TIMBER & LUMBER CO.

Circuit Court of Appeals, Fifth Circuit.
November 28, 1927.

No. 5171.

1. **Liens** ⊚⇒7—**Property of debtor is not subject to lien in favor of creditor, unless set apart or identified from other property which he may sell and not replace.**

Property of a debtor, in his possession, is not subject to an equitable lien in favor of a creditor, unless it is identified, or so described as to be capable of identification and separation from other property which the debtor is at liberty to sell to third parties, and to replace or not, as he sees fit.

2. **Bankruptcy** ⊚⇒188(3)—**Creditor held not to have lien on lumber for money advanced to enable bankrupt to produce it.**

Claimant, which advanced money to bankrupt to enable him to manufacture lumber, held not to have an equitable lien on the lumber produced where bankrupt was at liberty to dispose of it to any one and was under no obligation to replace it.

Appeal from the District Court of the United States for the Eastern District of Texas; W. Lee Estes, Judge.

In the matter of C. A. Magrill, bankrupt. R. F. Dorough, trustee, appeals from a decree establishing a lien in favor of the George W. Miles Timber & Lumber Company. Reversed.

H. E. Lasseter and Gordon Simpson, both of Tyler, Tex. (Lasseter & Simpson, of Tyler, Tex., on the brief), for appellant.

F. H. Prendergast, of Marshall, Tex. (Geo. Prendergast, of Marshall, Tex., on the brief), for appellee.

Before WALKER, BRYAN, and FOSTER, Circuit Judges.

WALKER, Circuit Judge. C. A. Magrill was adjudged bankrupt on January 27, 1927, on his voluntary petition filed a few days prior to that date. The appellee, a creditor of the bankrupt, asserted the claim that several million feet of lumber, which, when the bankruptcy petition was filed, was stacked

on the yards of several mills owned and operated by the bankrupt, was subject to an equitable charge or lien in favor of the appellee, as security for the debt owing to it. The transactions upon which the asserted claim was based are indicated by the following statement:

The bankrupt and the appellee entered into a written contract on April 28, 1926. By that contract the appellee agreed to advance the bankrupt $5,000 on May 1, 1926, and $5,000 on June 1, 1926, to cover lumber then stacked on yards of the bankrupt, for which advances the bankrupt agreed to deliver to appellee bills of sale showing the approximate amount of feet of lumber at each place, and that each pile shall be plainly marked "Property of Geo. W. Miles Timber & Lumber Company." The just mentioned part of that contract was fully performed; the bankrupt's obligations for the $10,000 advanced pursuant to the above-mentioned provisions having been fully discharged. The debt owing by the bankrupt to the appellee when the bankruptcy petition was filed was incurred after the obligation for the above-mentioned advances aggregating $10,000 were discharged, and was evidenced by several notes given at different dates between August 2, 1926, and December 19, 1926. The above-mentioned contract contains the following:

"For and in consideration of the employment of the Miles Company as sales representatives of C. A. Magrill, to the extent of at least 20 cars or more per month, to be shipped from either Gladewater, Tex., plant, or Rusk, Tex., plant, or both, the Miles Company agrees and binds themselves to sell the yellow pine products of C. A. Magrill to the extent of 20 cars per month or more, both at his Gladewater and Rusk operations, during the life of this contract to the very best advantages possible and at the best obtainable prices.

"The intent of this contract is that the Miles Company which has exclusive sales of all yellow pine of all orders taken and entered into, to the extent of at least 20 cars per month, and any orders, when accepted by C. A. Magrill, are binding on him, unless mutually agreed to the contrary.

"It is further agreed and understood that the Miles Company has the exclusive sale of all yellow pine products, to the extent of at least 20 cars per month, produced and manufactured at either the Gladewater or Rusk, Tex., plants, whether the yellow pine products at either plant is subject to a bill of sale to the Miles Company or not, and if any

yellow pine lumber is sold direct to any company by C. A. Magrill, and such sales are made, which preclude the possibility of C. A. Magrill complying with this contract by shipping the Miles Company at least 20 cars of lumber per month, then the Miles Company is to receive a selling commission on the sale, the same as though the order had gone through the office of the Miles Company. However, C. A. Magrill is not to sell any yellow pine on which the Miles Company has a bill of sale without permission of the Miles Company.

"C. A. Magrill agrees and binds himself to pay the Miles Company a selling commission of $1.50 per M on all common O lumber and $2.50 per M on all B & B tr. lumber net to the Miles Company on all yellow pine lumber shipped from Gladewater or Rusk, Tex., plants, to the extent of at least 20 cars per month. * * *

"The Miles Company agrees and binds themselves to pay promptly upon receipt of invoices and bill of lading on all shipments made and covered by this contract, approximately 70 per cent. of the f. o. b. mill sale price, less 2 per cent. discount (also selling discount and the balance of the sales price f. o. b. mill, less 2 per cent. discount, if settled within 60 days) is to be credited on the notes of C. A. Magrill as soon as freight bill and settlement is received from final purchaser of the lumber. * * *

"It is further stipulated and agreed that the Miles Company shall not be called upon to advance in excess of $10,000. This is the maximum amount to be advanced under this contract and agreement.

"This contract shall be binding on the day of execution, as represented by the signature hereunto attached, and shall remain in force for the period of one year, even though the advances made by the Miles Company shall have been fully paid prior to that time."

After the delivery of the lumber for which appellee got bills of sale, the bankrupt continued to make shipments to the appellee, but did not, except in one month, ship to appellee as much as twenty cars a month. During the time such shipments were made the bankrupt manufactured lumber and sold it wherever he could to the trade generally. It was thoroughly understood between the bankrupt and the appellee that the former could sell lumber to other customers, and a substantial part of the bankrupt's product was so disposed of. None of the lumber on the bankrupt's yards when the bankruptcy petition was filed was marked or designated in any

way as lumber subject to a charge or lien in favor of the appellee. After the obligation of the bankrupt for the original advances aggregating $10,000 was discharged, the appellee made additional advances to enable the bankrupt to operate his several sawmills, to pay his hands, to feed his teams, to purchase timber, etc. On the debts so incurred the bankrupt made payments by shipments of lumber pursuant to the contract, but at the date of the filing of the bankruptcy petition the bankrupt owed on that indebtedness a balance of more than $9,500.

The contract did not require any identified lumber to be held for or shipped to the appellee, except that which it was to get in consideration or by reason of the advances agreed to be made on May 1 and June 1. Above-quoted provisions of the contract indicate that it was intended to be permissible for the bankrupt to ship to appellee less than 20 cars of lumber per month, and, without permission of appellee, to sell to others any lumber not covered by a bill of sale made to appellee, but that, in case of the bankrupt's failure to ship to appellee at least 20 cars of lumber per month, the bankrupt was to be liable to the appellee for the stipulated selling commission on at least that amount of lumber per month. It appears that appellee was willing to forego the handling by itself as the bankrupt's sales representative of part, at least, of the lumber required to make twenty carloads a month, on condition that the bankrupt be liable for the stated commission on lumber otherwise disposed of by him. Under the contract as it was practically construed by the parties by their transactions under it, the bankrupt was at liberty to sell to the trade generally any part of the lumber produced and on hand at any given time during the period when the unpaid indebtedness of the bankrupt to the appellee was incurred.

The evidence did not show that all the lumber on hand when the bankruptcy petition was filed, or any definite and identified part thereof, was made subject to a charge or lien in favor of the appellee for the amounts advanced by it to enable the bankrupt to produce that lumber, or was so withdrawn from the bankrupt's dominion as not to be subject to be sold or disposed of by him to third parties. On the contrary, the evidence indicates that it was consistent with the contract, as practically construed by the parties, for the lumber on hand when the bankruptcy petition was filed to be treated as a stock of merchandise subject to be sold by the bankrupt to any one desiring to make purchases therefrom, without any obligation on the bankrupt to replace the lumber so sold. [1] Such a claim as the one asserted, that property in possession of a debtor is subject to a lien or charge in favor of a creditor to secure a debt to the latter, is not sustainable, unless the property intended to afford security is identified, or so described as to be capable of identification and separation from other property or assets of the debtor, which the latter is at liberty to dispose of to third parties free of any charge or lien, and to replace it, or not, as he sees fit. Walker v. Brown, 165 U. S. 654, 17 S. Ct. 453, 41 L. Ed. 865; National City Bank v. Hotchkiss, 231 U. S. 50, 34 S. Ct. 20, 58 L. Ed. 115.

[2] Counsel for the appellee invoked the decision in the case of Hurley v. Atchison, Topeka & Santa Fé Ry., 213 U. S. 126, 29 S. Ct. 466, 53 L. Ed. 729. The facts of that case distinguish it from the instant one, in that in the cited case a railway company, which by contract was entitled to get from a mine all the coal required by it in the operation of certain of its lines of railroad, made advances to the operator of the mine to enable the latter to mine coal to that amount, which was held to be subject to a charge or lien for such advances; while in the instant case the advances of the appellee were made for the purpose of enabling the bankrupt to produce lumber, all or an undefined part of which he was at liberty to dispose of to any one, without any obligation to replace the lumber so disposed of. We conclude that the appellee was not entitled to a lien or charge on the lumber in question, because that lumber was the bankrupt's stock in trade, from which he was permitted to make such sales as he chose to make, without any obligation to replace the lumber sold to third parties.

In view of the above-stated conclusion, it is not material to determine whether, if the asserted lien or charge had existed, it would or would not have been superior to the right to the lumber conferred on the trustee of the bankrupt's estate by amended section 47a of the Bankruptcy Act (11 USCA § 75).

The decree is reversed.