REVISED - August 9, 1999

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 98-20331

IN RE: "RONFIN" SERIES C BONDS SECURITY INTEREST LITIGATION

KLESCH & COMPANY LIMITED; ET AL.

Plaintiffs,

KLESCH & COMPANY LIMITED,

Plaintiff-Appellant,

versus

NAURU PHOSPHATE ROYALTIES (HONOLULU), INC.;
NAURU PHOSPHATE ROYALTIES (HOUSTON) INC.;
NAURU PHOSPHATE ROYALTIES DEVELOPMENT
(HONOLULU), INC;  NAURU PHOSPHATE ROYALTIES, INC.,

Defendants-Appellees.

KLESCH & COMPANY LIMITED,

Plaintiff-Appellant,

versus

NAURU PHOSPHATE ROYALTIES (HOUSTON) INC.,

Defendant-Appellee.

KLESCH & COMPANY LIMITED,

Plaintiff-Appellant,

versus

NAURU PHOSPHATE ROYALTIES, INC.,

                                                      Defendant-Appellee.

_____

KLESCH & COMPANY LIMITED,

                                                      Plaintiff-Appellant,

versus

NAURU PHOSPHATE ROYALTIES (HONOLULU), INC.,

                                                      Defendant-Appellee.

---

Appeal from the United States District Court
for the Southern District of Texas

---

August 6, 1999

Before SMITH, DeMOSS, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

The court below granted summary judgment on plaintiff-appellant's claim for an equitable lien. Specifically, it held that plaintiff-appellant could not point to a genuine issue of material fact as to any of the requisite elements for such a claim. On appeal, plaintiff-appellant argues that the court below erred when it found that it could not grant the lien as a matter of law. For the reasons set forth below, we affirm.

## FACTUAL & PROCEDURAL BACKGROUND

This case begins on the tiny tropical island of Nauru, located in the Pacific Ocean near the coast of Japan. Governing the approximately ten thousand people residing on this island is the Republic of Nauru ("the Republic"), a democratic government that is also one of the world's smallest sovereign nations. One of the things Nauru is known for is its rich phosphate deposits; accordingly, the Republic generates a significant amount of revenue from the export and sale of this natural resource.

Realizing that these phosphate reserves cannot last forever (and in 1989, were estimated to last only another eight or ten years), the Republic set aside a fixed portion of the revenues derived from the phosphate sales into seven Trust Funds. In 1968, the Republic organized a statutory trust known as the Nauru Phosphate Royalties Trust ("Trust") to administer these funds so that the nation will continue to have adequate income well into the future. At the time the events that led to this lawsuit transpired, the Trust administered almost a billion dollars worth of assets.

In furtherance of its objective, the Trust organized several subsidiaries based in the United States, four of which were named as defendants in the consolidated action. The Trust is the sole shareholder of defendant-appellee (1) Nauru Phosphate Royalties, Inc. ("NPR"). In turn, NPR is the sole shareholder of defendants-appellees (2) Nauru Phosphate Royalties (Houston), Inc. and (3) Nauru Phosphate Royalties (Honolulu), Inc. The last of these is the sole shareholder in defendant-appellee (4) Nauru Phosphate Royalties Development (Honolulu), Inc. (collectively, "Trust Subsidiaries"). Three properties owned by the Trust Subsidiaries, namely Kaka'ako Land in Honolulu, the Pacific House in Washington D.C., and the Singer Building in Houston (collectively, "Properties"), are the subject of this lawsuit.

In 1972, the Republic enacted the Republic of Nauru Finance Corporation Act ("The RONFIN Act"), which created the Republic of Nauru Finance Corporation ("RONFIN") to carry on the business of finance and investment, including the issuance of securities. According to the RONFIN Act, the Republic is a statutory guarantor of the liabilities and obligations of RONFIN. Furthermore, the RONFIN Act provides that the Cabinet "may, if it considers it expedient to do so, direct that the assets of any one or more of" the Trust Funds discussed above "are to be charged or deposited to secure the repayment of any moneys borrowed by the Corporation or any credit to it." These provisions are important because the Properties owned by the Trust Funds, through the Trust Subsidiaries, are the subject of this lawsuit.

On July 21, 1989, RONFIN issued bearer bonds known as RONFIN Japanese Yen Bonds Series C ("Series C Bonds"), having an aggregate face value of five billion yen. Although the

3

RONFIN bonds were originally due for repayment on July 27, 1994, by agreement of the original bondholders the maturity date was postponed to April 27, 1995. However, RONFIN did not pay the bond debt on that day, nor has it made any payment since then.

Approximately one month before the bonds were to have matured, plaintiff-appellant Klesch & Co., Limited ("Klesch"), purchased certain Series C Yen Bonds ("Bonds") with a face value of one billion yen (worth approximately $9.4 million at the time of the summary judgment proceedings) in the secondary bond market at a discount rate, and registered its ownership of the Series C Bonds in Japan. Klesch is a privately owned British company that focuses on the distressed securities market, i.e. defaulted bonds. As noted above, on April 27, 1995, RONFIN defaulted on the Bonds. After making repeated demands to the Republic for repayment,[1] on June 1, 1995, Klesch filed suit in Japan against the Republic and RONFIN seeking judgment for the full amount owed to Klesch.[2] After initially refusing to accept service in this lawsuit and agreeing to appear only to contest the jurisdiction of the Japanese courts and to assert sovereign immunity, the Republic has now filed a complete answer on the merits. This suit remains pending in Japan.

In May and June 1995, Klesch filed suit in several state courts in the United States against specific properties owned by the Trust Subsidiaries in those jurisdictions. These lawsuits do not name the Republic or RONFIN as defendants; instead, they name the specific Trust Subsidiary in control of the property in the relevant jurisdiction. The first of these lawsuits was filed in the territorial court system in Guam against the Republic of Nauru (Guam), Inc., and sought an equitable lien on real property owned by that defendant in Guam. In February 1997, the Superior Court of Guam granted

---

[1]On April 27, 1995, the day RONFIN defaulted on the Bonds, Klesch wrote to the other Series C Bondholders and proposed that it represent all of the bondholders in litigation against, and in negotiations with, the Republic to secure repayment of the Bonds. Klesch proposed a fee of 15% of all amounts recovered and a contribution by each bondholder of 1% of the face value of the Bonds held by it toward the cost of legal proceedings. To date, none of the other bondholders has accepted Klesch's invitation.

[2]Klesch had also purchased Series B Bonds with a face value of 300 million yen on the same day it purchased t he Series C Bonds. Its Japanese lawsuit deals with both the Series B and Series C Bonds, although the case before this court deals only with the Series C Bonds.

4

summary judgment in favor of the defendant. Although Klesch lodged an appeal in the Supreme Court of Guam, that appeal was eventually dismissed for lack of prosecution.

The other three American suits were filed in Texas, Hawaii, and Washington, D.C. against the Trust Subsidiaries for property owned by them in their respective jurisdictions. After the Trust Subsidiaries removed the cases to federal court, the Judicial Panel for Multidistrict Litigation, pursuant to 28 U.S.C. § 1407, consolidated and transferred the cases to United States District Court for the Southern District of Texas. In these consolidated cases, Klesch asserts that the Republic's default on the bonds creates a right to have an equitable lien imposed in its favor on the Properties.[3] To this end, Klesch utilizes language from several documents having to do with the Bond issuance: (1) the Placement Memorandum; (2) the Purchase Agreement; (3) the Conditions of Bond; and (4) the Conditions of Guarantee (collectively, "Bond documents").

After determining that it was the proper forum, that the defendants before it were the proper parties, and that the laws of Texas, Hawaii, and D.C. (as opposed to Japanese law) were the correct choices of law, the district court on April 2, 1997, granted summary judgment in favor of the Trust Subsidiaries. The court reasoned that Klesch could not point to a genuine issue of material fact as to any of the three elements of an equitable lien claim. The district court entered final judgment on March 5, 1998, after denying Klesch's motion to stay entry of final judgment and for reconsideration. This appeal followed.[4]

## DISCUSSION

## I

---

[3]In July and September 1996, and in February 1997, Chase Manhattan ("Chase") purchased Series C Bonds with a total face value of 1.350 billion yen (worth approximately $11 million at the time of the summary judgment proceedings). Subsequently, the district court granted Chase's motion to intervene as an additional plaintiff. Chase did not appeal the district court's decision granting summary judgment against it, and therefore is not a party to the instant appeal.

[4]The parties do not dispute the district court's determinations as to the correct forum, the proper parties, or the applicable choice of law.

We review *de novo* the denial of equitable relief when that denial stems from a matter of law. See F.D.I.C . v. Dawson, 4 F.3d 1303, 1308 (5th Cir. 1993). Alternatively, we review for an abuse of discretion a district court's denial of equitable relief when that denial stems from its weighing of the equities. See National Ass'n of Gov't Employees v. City Pub. Serv. Bd., 40 F.3d 698, 707 (5th Cir. 1994). Defendants-appellants contend that the abuse of discretion standard applies in this case because, they say, the district court weighed the equities before issuing its decision. We disagree. The court below held that equitable relief was unavailable as a matter of law; it did not withhold such relief simply as a matter of discretion. Consequently, we review *de novo* the decision of the district court. See Dawson, 4 F.3d at 1308 (reaching similar result).

The court below disposed of Klesch's equitable lien claim on summary judgment. Of course, we review *de novo* the grant of summary judgment, applying the same criteria as did the district court. See id. at 1306. As such, we review the evidence and draw all inferences in the light most favorable to the nonmovant. See id. "Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Id. (citing FED. R. CIV. P. 56(c)).

## II

The district court held that to obtain an equitable lien, Klesch had to satisfy three elements:

(1)     that there exists an express or implied agreement between the parties demonstrating a clear intent to create a security interest in order to secure an obligation between them;
(2)     that the parties intended specific property to secure the payment;
(3)     and that there is no adequate remedy at law.[5]

After closely scrutinizing each of these elements, the court concluded that Klesch could not point to a genuine issue of material fact as to any of them. As a matter of law, then, the court rendered

---

[5]Klesch argues that the court below erred in requiring it to satisfy this third element; accordingly, Klesch submits that the proper test consists of only the first two elements. We discuss this argument in more detail *infra*.

summary judgment in favor of the Trust Subsidiaries. On appeal, Klesch advances challenges to the district court's conclusion as to each element. We discuss each of these challenges below.

**A**

Because the second element is the most direct way in which to dispose of this appeal, we begin our analysis there. To obtain an equitable lien, the plaintiff must show that "the parties intended specific property to secure payment." In re Daves, 770 F.2d 1363, 1367 (5th Cir. 1985). This property must be identified "with reasonable certainty." See Skip Kirchdorfer, Inc. v. United States, 6 F.3d 1573, 1581 (Fed. Cir. 1993). Most importantly for purposes of this appeal, the property must be distinguished from the general assets of the debtor. See In re Magrill, 22 F.2d 757, 758 (5th Cir. 1927).

The district court held that, as a matter of law, the Bond documents did not contain a specific identification sufficient to allow the court to conclude that the parties intended to secure the Bonds with the three Properties. After finding (1) that the Bond documents identified several properties with which the Republic could secure the Bonds, and (2) that the Bond documents gave the Republic discretion to choose which of these properties it could use in this effort, the court rejected Klesch's claim. It reasoned that:

> If the Republic of Nauru has the discretion to choose which Fund, and which investment or asset contained in the Funds, to charge to secure repayment of the Series C Bonds, the specific Properties have not been sufficiently identified to permit the imposition of an equitable lien on those Properties.

On appeal, Klesch begins by reiterating the argument it made to the district court that the three Properties in question were, in fact, sufficiently identified in the Bond documents. Initially, Klesch points out that Condition 1 of the Conditions of Guarantee provides that the "Cabinet of the Republic shall, if necessary, direct that the assets of one or more of the funds as referred to in Condition 18 of the bonds are to be charged or deposited to secure the repayment of any monies borrowed by RONFIN or any credit granted to it." Condition 18 of the Conditions of Bonds points to: "[A]ny funds governed by the Nauru Phosphate Royalties (Payment and Investment) Act of 1968,

7

as amended, and the Nauru Phosphate Royalties Trust Ordinance 1968 . . . ." Finally, the Placement Memorandum provides that, with emphasis added by this court:

> The property investments of the Funds include ownership of Nauru House, Savoy Plaza Hotels, Prima House and Islanders Place, Melbourne; *Kaka'ako Land, Honolulu*; 3 Chesham Street, London; Sheraton Hotels; Auckland and Rotorua, New Zealand, *Pacific House, Washington*; and the *Singer Building, Houston*. In addition, the Funds have equity interest in their properties such as Pacific Star Hotel, Guam and Pacific Star Building, Manila with the balance of such ownership being the other entities of the Republic of Nauru.

According to Klesch, these three references in the Bond documents together lead to the conclusion that the properties are sufficiently identified.

Second, Klesch contends that, in contrast to the district court's holding, equitable liens may be imposed where the debtor retains discretion to choose which asset will serve as the security interest. Klesch principally relies on the Supreme Court's opinion in Sexton v. Kessler & Co., 225 U.S. 90 (1912). In Sexton, the creditor entered into an agreement with the debtor that a certain amount of securities may be kept in an escrow account separate and apart in the hands of the debtor and the debtor had the power to make substitutions of the securities at its discretion. See id. at 96. The Court held that the creditor had an equitable lien, even though the debtor could substitute the securities in the account. See id. at 98. Relying on Sexton, Klesch submits that the district court erred in requiring the Republic to have given up all discretion regarding the asset alleged to be security. Finally, Klesch contends in the alternative that there is at least a genuine issue of material fact as to whether the Bond documents sufficiently identify the Properties so as to create an equitable lien.

Klesch misreads Sexton, overlooking the critical fact that the debtor's right to replace the securities in the specified account was limited to "others of equal value." See id. at 95. In light of this, the fact that the debtor in Sexton could substitute security interests was of little consequence; there was no doubt as to which property would serve to satisfy the unpaid debt (the escrow account), nor as to the value of that property.

8

In the instant matter, Nauru did not establish a certain, specified, fixed-value escrow account for satisfaction of its debt in the event of default, merely retaining the right to alter the contents of the account without changing its value. Instead, Nauru retained plenary control over which of its various properties would be used to satisfy the debt. At no point was any particular property or set of properties specifically fixed as the debt's potential source of satisfaction, subject perhaps to future substitution by other property of equal value. Such discretion over multiple properties of differing values precludes the finding of specificity essential to the recognition of an equitable lien.

**B**

In the alternative, we consider Klesch's challenges to the district court's decision as to the first and third elements of the equitable lien test. As a matter of convenience, we begin by addressing the third element of the equitable lien claim. Klesch contests the district court's conclusion that it needed to prove a third element of the equitable lien claim, namely that there did not exist an adequate legal remedy. The court found that Klesch could not prove this element as Klesch had filed a lawsuit in Japan for damages resulting from the default on the Series C Bonds. The court further held that this legal alternative was adequate as a matter of law because the Japanese lawsuit was proceeding smoothly, there was no attempt by the Republic to sell or hide its assets in other countries, and that the fact that the Republic did not have any assets in Japan was irrelevant as Klesch could enforce a judgment elsewhere in the world (presumably including the United States).

On appeal, Klesch offers several attacks on the district court's analysis. Klesch initially submits that it need not prove the third element because of the Supreme Court's decision in Seymour v. Freer, 75 U.S. 202 (1868). According to Klesch, the Seymour Court held the right to proceed in equity to enforce a lien and the right to sue on a contract are concurrent remedies, and "the remedy in equity is the better one." Id. at 215. Klesch erroneously reads Seymour. The Seymour Court addressed the question of whether a legal remedy was available *in addition* to an existing equitable remedy to enforce a trust. See id. This reading is consistent with the general rule that a court in equity should not act when the moving party has an adequate remedy at law. See Morales v.

9

TransWorld Airlines, Inc., 504 U.S. 374, 381 (1992); see also Palmco Corp. v. American Airlines, Inc., 983 F.2d 681, 686 n.9 (5th Cir. 1993) (holding that specific performance was not available to a party who can sue for breach of contract).

Next, Klesch contends that the Japanese lawsuit was inadequate because the defendants in that lawsuit (RONFIN and the Republic) were not the same as existed in the present case (the Trust Subsidiaries). See Mort v. United States, 86 F.3d 890, 893 (9th Cir. 1996).[6] As the Trust Subsidiaries observe, however, courts have not rigidly adhered to the general rule describe in Mort, and have made exceptions when there is a close relationship between the two parties. See, e.g., O'Neal v. Southwest Mo. Bank, 118 F.3d 1246, 1253 (8th Cir. 1997) (holding that bankruptcy court correctly declined to impose a constructive trust or an equitable lien on debtor's bank where the plaintiff had an adequate legal remedy for money damages against debtor); TCF Banking & Sav., F.A. v. Loft Homes, Inc., 439 N.W.2d 735, 740 (Minn. Ct. App. 1989) (reviewing cases and stating that equitable relief should be barred where plaintiff has an adequate legal remedy against the same party "or a closely related governmental entity."). Applying this exception to the facts in this case, we cannot ignore the close relationship the Republic has with the Trust Subsidiaries. Accordingly, we reject Klesch's argument to the contrary.[7]

---

[6]This argument was considered, and rejected, by the district court. The district court acknowledged that Klesch correctly stated the general rule, but held that an exception existed in *quasi in rem* proceedings like this one. See Mort v. United States, 86 F.3d 890, 893 (9th Cir. 1996). The district court distinguished Mort by noting that the instant case was a *quasi in rem* action, and that the rule specified in Mort did not encompass such cases. The district court did not cite any authority for this holding. On appeal, Klesch submits that the rule in Mort does apply to *quasi in rem* action, and cites Hill v. Hill, 345 P.2d 1015, 1025 (Kan. 1959). The Trust Subsidiaries do not challenge Klesch's citation to Hill, nor does it defend the district court's reasoning on this point. Instead, it offers an alternative justification for the district court's conclusion, which we address *infra*.

[7]In response, Klesch contends that the Trust Subsidiaries cannot now argue there exists a close relationship between themselves and the Republic when on summary judgment they argued that they were not the proper parties to this case. See Ergo Science, Inc. v. Martin, 73 F.3d 595, 598 (5th Cir. 1996) ("Judicial estoppel prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same proceeding."). We decline Klesch's invitation, however. The Trust Subsidiaries' motion for summary judgment, which the district court rejected, argued that the Republic and RONFIN, and not they, were the proper parties to the United States litigation. This was simply a matter of proper pleading. That argument did not challenge the view that the Trust Subsidiaries are closely related to the Republic and RONFIN.

10

Getting to the heart of the matter at last, Klesch argues that the district court erred in finding that the Japanese lawsuit was an adequate legal remedy because the defendants there at one point resisted jurisdiction and asserted sovereign immunity, and because the Republic is not solvent. See Surko Enter., Inc. v. Borg-Warner Acceptance Corp., 782 S.W.2d 223, 225 (Tex. App. – Houston [1st Dist.] 1989, no writ) (holding a legal proceeding to be inadequate where the debtor was not solvent). We adopt the district court's findings on this point, however. The problems faced by Klesch are the ordinary ones faced everyday by litigants, and we note that the defendants in the Japanese lawsuit have now filed a complete answer on the merits. Additionally, if Klesch emerges victorious in Japan it can enforce a judgment elsewhere in the world. Consequently, we agree with the district court's conclusion that Klesch cannot as a matter of law satisfy this third element of the equitable lien claim.

## C

Finally, Klesch challenges the district court's conclusion as to the first element of the equitable lien claim. The court found that Klesch could not satisfy the first element because, even assuming Klesch was correct in its interpretation of the Bond documents, the documents did not create a present right to a security interest in the three Properties. Instead, at most the Bond documents created a conditional promise to grant, in the future, a right to a security interest. Relying again on Sexton, the court held that there is a difference between giving an "absolute present right to security," which can be the basis for an equitable lien, and a promise of action in the future to create a right of security, which does not give rise to an equitable lien. Finding that the Bond documents created the latter, the court specifically looked to Condition 1 of the Conditions of Guarantee. Again, that document states, with emphasis added by this court, that "the Cabinet [of the Republic] *shall, if necessary*, direct that the assets of any one or more of the funds as referred to in condition 18 of the Bonds [i.e the assets of the Trust subsidiaries, including the Properties] are to be charged or deposited to secure the repayment of any moneys borrowed by RONFIN or any credit granted to it."

11

The court reasoned that this language does not create an equitable lien because it is *conditioned* on a future event: specifically, the decision by the Republic's Cabinet to direct the assets be charged.

On appeal, Klesch submits that an agreement to give security conditioned on a future event can give rise to an equitable lien.[8]   It begins by challenging the district court's interpretation of Sexton. The district court read Sexton too broadly, according to Klesch; the better interpretation is one in which the basis for an equitable lien need only be more than a "general promise" and is "a question of more or less." See 225 U.S. at 98.  If so, the Guarantee is a clear example of "less." Klesch did not show that the Guarantee is anything more than a general promise.  Indeed, the Guarantee is wholly unlike the "absolute present right" that the Sexton Court held to create an equitable lien.  First, the commitment in the Guarantee to give security is not absolute, as it was in Sexton, but instead is conditioned upon the Republic's future determination that a pledge is necessary.  Second, that the Republic had much greater discretion over the alleged security interest than the debtors in Sexton to choose exactly which of its many assets will be used as security, and to replace securities without an obligation to replace them.  Accordingly, the district court's interpretation of Sexton was correct.  See id. (noting that "a general promise to give security in the future is not enough").

Next, Klesch cites several cases from other jurisdictions as support for its argument that an agreement to give security in the future is enforceable by an equitable lien.  It relies most heavily upon In re Cutty's-Gurnee, 133 B.R. 948-49 (Bankr. N.D. Ill. 1991), which it interprets to hold that

_____

[8]Klesch also submits that we should not consider the fact that the Republic's Cabinet has so far refused to direct the assets in the Funds as required by Condition 1.  We are sitting as a court of equity, says Klesch, and we should not allow a party to rely on its own failure to complete a condition, which was required by the agreement, to argue that the equitable lien has not yet been created.  See Luse v. Rea, 207 S.W. 942, 944 (Tex. Civ. App. – Amarillo 1918), aff'd 231 S.W. 310 (Tex. 1921) ("The maker of a note ought not be heard to say that he has not done that which he ought to have done to secure repayment of these notes.").  Similarly, Klesch points out that allowing the Trust Subsidiaries to rely on the condition that it had no plan ever to carry out would be to allow a fraud upon the bondholders.  As the district court correctly observed, however, Klesch's argument misses the mark.  The Trust Subsidiaries "need not rely on equity to defeat [Klesch's] arguments. Rather, [the Trust Subsidiaries] rely on the unambiguous language of the bond documents in opposing [*Klesch's*] request for equitable relief." (emphasis in original).

a present security interest is created even when the agreement to provide security requires an additional, future act by the debtor – in that case, the creation of a mortgage in favor of the creditor.[9] In re Cutty's-Gurnee is inapposite, however. The court there held that a future security interest could give rise to an equitable lien, but only where the creating language does not reserve any discretion to the debtor. See 133 B.R. at 948. This circumstance is in stark contrast with the case at bar, where discretion was given to the debtor via the "if necessary" language.

The proper focus here is on whether the parties have manifested an intent to utilize certain property to secure debt. The answer lies largely in whether the agreement speaks in discretionary or mandatory terms. If the agreement speaks mandatorily—even if conditionally—then there is strong evidence of such an intent. Whether the promise in question was conditional or future-oriented is not particularly important—an agreement that mandatorily attaches property to secure debt on the occurrence of some future event implicates both conditionality and future-orientation, but is still mandatory in nature, and thus still manifests the intent to create a security interest. Thus, the discretionary "if necessary" language of the instant agreement is critical, because it belies the notion that the agreement manifested an intent to create a security interest: It fails to commit the debtor to using its property, under any objective set of circumstances, in satisfaction of its debt.

A second factor weighing against Klesch is the fact that the subject property has no "separation from other property or assets of the debtor." See in re Magill, 22 F.2d at 759. Such separation often accompanies or evinces a certain dispossession of control, which is forceful evidence

---

[9]Klesch also argues that, even if we were to find that its right to an equitable lien did not exist prior to the occurrence of the contingency, the equitable lien must have arisen when RONFIN defaulted on the Bonds. The district court expressly rejected this argument, noting that such a conclusion

> is inconsistent with the plain language of Condition 1, which states that on default, the Republic of Nauru *shall if necessary, direct* that the assets of one or more of the Funds are to be charged or deposited. The Guarantee requires that the guarantor take specific action before any lien would be created. Moreover, the Placement Memorandum clearly discloses that many of the listed assets were already statutorily dedicated for other uses, or already pledged or encumbered, when the bonds were issued.

(emphasis in original). We agree with the district court's view and thus reject Klesch's argument to the contrary.

that the property was intended to be subject to a security interest. In <u>Sexton</u>, for example, the debtors "placed in a separate package in their safe deposit vaults certain securities named, the package being marked, 'Escrow for account of Kessler & Co, Limited, Manchester[.]'" <u>Sexton</u>, 225 U.S. at 95. Although the debtor did have the right, under the agreement, to make substitutions, there was, at all times, some specific property held separately from the general assets of the debtor and plainly marked as being subject to a security interest. The circumstances in <u>Sexton</u> markedly differ from those present here, because in none of the three documents cited by Klesch were the three properties set aside or distinguished from any of the other properties listed therein.[10]

**CONCLUSION**

Because we agree with the district court that Klesch cannot establish any of the elements of the equitable lien claim, we need not reach the argument that Klesch should be collaterally estopped from asserting an equitable claim in the instant case because it has already lost a virtually identical litigation in Guam. For the reasons set forth above, we AFFIRM the district court's grant of summary judgment against Klesch.

---

[10]For the first time on appeal, Klesch claims it has a security interest under the equal and ratable clause of Condition 18 of the Condition of Bonds. Klesch argues that an equal and ratable clause based on an affirmative pledge gives rise to an equitable interest at the time of the undertaking. We dismiss Klesch's last minute use of the equal and ratable clause as an attempt to raise a new issue on appeal. <u>See United States ex rel. Wallace v. Flintco Inc.</u>, 143 F.3d 955, 971 (5th Cir. 1998).