## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-20014

United States Court of Appeals
Fifth Circuit

**FILED**
April 23, 2018

Lyle W. Cayce
Clerk

JEFFREY C. BAILEY; RIG-UP SERVICES, L.L.C.,

Plaintiffs - Appellants

v.

SHIRLEY BAILEY; ROGER BAILEY; BAILEY CONSULTING, L.L.C.; RIG-UP ELECTRICAL SERVICES, INCORPORATED,

Defendants - Appellees

Appeals from the United States District Court
for the Southern District of Texas
USDC No. 4:12-CV-1711

Before DAVIS, HAYNES, and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:*

A near decade-long family dispute involving Jeffrey Bailey and his parents, Shirley and Roger Bailey, is before us a second time. Jeffrey[1] purchased the assets of his parents' company in 2008. Before that sale, Jeffrey was in charge of the company's operations. From the first quarter of 2007 until

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] Because this case involves three family members with the same last name (Shirley, Roger, and Jeffrey Bailey), we will refer to the parties by their first names.

No. 17-20014

the execution of the purchase agreement, the company failed to forward its employees' payroll taxes to the IRS. After the sale, Jeffrey sought a declaratory judgment that his parents are responsible for the unpaid taxes. In the parties' earlier visit to this court, we held that the sales agreement required the parents' company to pay any tax liabilities accruing before the sale. But we remanded because Shirley and Roger had argued "the Agreement was unenforceable because Jeffrey Bailey induced it through fraud." *Bailey v. Bailey*, 584 F. App'x 220, 221 (5th Cir. 2014).

The district court then held a bench trial on that fraudulent inducement defense. It concluded that Jeffrey fraudulently induced his parents into entering into the sale because he knew about the outstanding liability but did not disclose it to them. As a result, the court declared Jeffrey responsible for the unpaid tax liability. Jeffrey now argues that a jury should have decided the issue, that the evidence did not support a finding of fraudulent inducement, and that in any event the inducement defense would not support an order requiring Jeffrey to pay the presale taxes. We reject his first two contentions and thus uphold the finding of fraudulent inducement. But we agree that a finding of fraudulent inducement does not allow a court to rewrite the contract that made the parents liable for those taxes. So we remand to allow Shirley and Roger to elect whether they want to rescind the contract, which is the remedy they originally sought in asserting fraudulent inducement.

I.

We recite the facts in the light most favorable to Shirley and Roger because the factfinder ruled in their favor. They owned Rig-Up Electrical Services, Inc. (Electrical), an Arkansas corporation with a satellite location in Channelview, Texas. Shirley served as Electrical's president, while her son Jeffrey served as Executive Vice President of the Texas location. In 2007, Shirley and Roger were considering retirement and no longer wanted to

manage Electrical's operations.  They left Jeffrey in charge of managing the company.

Although Shirley retained the title of President, she assumed a smaller function at the company and even stopped paying herself.  Michelle Reed, Electrical's bookkeeper, was responsible for handling the company's books, including calculating its weekly payroll, tax deposit, and operating expenses. With Jeffrey in charge of managing the company, Shirley's only remaining role was to make weekly draws on Electrical's line of credit at an Arkansas bank based on information provided by Reed for the amounts needed to cover the company's expenses.  After Shirley would transfer the funds needed on a weekly basis from the Arkansas bank to another bank in Texas, Reed would disburse the money from the Texas account.

In January 2008, Jeffrey, who started a new company under the name Rig-Up Services, L.L.C. (Services), expressed interest in purchasing Electrical's assets.  To help secure financing, Jeffrey hired Roy Johnson to serve as Electrical's Chief Financial Officer.  Jeffrey and Johnson then hired Harris Arthur, a certified public accountant, to review Electrical's financial records and provide accurate financial reports that a lender would accept. Electrical's payroll and required tax deposits were computed on a weekly basis using accounting software.

In April or May of 2008, Arthur realized that the software showed that payroll taxes had been sent to the IRS when bank records showed they had not. This concerned Arthur because the "apparent tax liability looked awful[ly] high."  He first asked Reed if she had made the payments.  After not receiving a satisfactory answer, he then talked to Jeffrey and Johnson about the tax liability he had discovered.  On July 29, with the issue still not resolved, Arthur sent a letter to Jeffrey asking him to sign a power of attorney so a request could be sent to the IRS for information showing Electrical's history of payroll tax

payments. He confirmed with the IRS a few days later that Electrical owed over a million dollars in unpaid payroll taxes.

Meanwhile, the IRS sent two letters to Shirley and Roger requesting Electrical's tax returns for both unemployment and payroll taxes because they had not been timely filed. After receiving the second tax return request in late July, Shirley immediately faxed it to Jeffrey at the Channelview office. During a phone conversation, Jeffrey assured her that he had taken care of the problem.

On August 12, Jeffrey and his parents executed the asset purchase agreement. Shirley sold Electrical's assets at an $8 million discount ($4 million when the asking price on the market was $12 million) to her son because of the family tie and her trust in him to run the business. Soon after the sale, Arthur sent a letter to Shirley explaining that Electrical had been withholding funds from its employees' paychecks but not transferring the money to the IRS. This information had been kept from Shirley until after the deal closed. In an email sent six days before the execution of the agreement, Johnson instructed Arthur to "[f]ocus on the Cash Flow Budget for Wells Fargo now" and to "leave the tax thing alone for now." Shirley thus was surprised to learn that Electrical had an outstanding payroll tax liability. She testified that neither Reed nor her son had told her about it.

Once everyone knew about the problem with the payroll taxes, the parties disputed who had to pay them. Jeffrey filed this diversity suit in federal court seeking a declaratory judgment that the obligation belongs to Shirley, Roger, and Electrical. Under the terms of the agreement, only certain preexisting "liabilities and obligations" of Electrical transferred to Services. Those specified liabilities did not include payroll taxes, so we held in the first appeal that Services and Jeffrey were not contractually liable for the outstanding payroll taxes. *See Bailey*, 584 F. App'x at 221–22. But we

No. 17-20014

remanded for consideration of the parents' defense that they would not have sold the assets to Jeffrey at the steep discount had they been told about the tax liability. *Id.*

On remand, the district court agreed after a bench trial that Jeffrey fraudulently induced the sale. As a result of that conclusion, the district court entered a final judgment declaring that "Jeffrey C. Bailey and Rig-Up Services, LLC, are responsible for the unpaid payroll taxes of Rig-Up Electrical Services, Inc., as well as interest and penalties for both taxes and trust funds."

## II.

Jeffrey first contends that the district court improperly found that he waived his request for a jury trial. The argument focuses on details about the timing of Jeffrey's jury demand and the district court's notice of the trial setting, but we reject the claim for a more fundamental reason: the defense of fraudulent inducement is an equitable claim for which there is no right to a jury.

Under Texas law, the right to a jury trial is preserved "without distinction, to both law and equity cases." *Franzetti v. Franzetti*, 120 S.W.2d 123, 126 (Tex. Civ. App.—Austin 1938, no writ); *see also Humble Oil & Refining Co. v. Sun Oil Co.*, 191 F.2d 705, 711 (5th Cir. 1951) (explaining that because there is no clear distinction between law and equity in Texas, "[a]ll rights and remedies are administered together by one civil action and in the same proceeding"). But federal law determines the right to a jury trial in diversity cases. *Simler v. Conner*, 372 U.S. 221, 222 (1963) ("In diversity cases, of course, the substantive dimension of the claim asserted finds its source in state law, but the characterization of the state-created claim as legal or equitable for purposes of whether a right to a jury trial is indicated must be made by recourse to federal law."); *Fletcher v. McCreary Tire & Rubber Co.*, 773 F.2d 666, 668 (5th Cir. 1985); *Humble Oil*, 191 F.2d at 718. A fraudulent

5

inducement defense, as opposed to a common-law fraud claim, is a claim in equity. *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 289 (1940) ("That a suit to rescind a contract induced by fraud and to recover the consideration paid may be maintained in equity, at least where there are circumstances making the legal remedy inadequate, is well established."); *Scott v. Sebree*, 986 S.W.2d 364, 368 (Tex. App.—Austin 1999, pet. denied). Indeed, both during and after trial Jeffrey acknowledged that fraudulent inducement falls on the equity side of the traditional divide. One consequence of that classification is that the federal trial right, unlike its Texas counterpart, does not extend to equitable claims. *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989).

So Jeffrey had no right to demand a jury. As we will discuss later, however, the equitable nature of the inducement defense has consequences for the remedy the district court ordered.

### III.

Having determined that the court had the authority to resolve this dispute, the next question is whether it resolved it correctly or at least within the discretion it receives in deciding the facts. *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 262 (5th Cir. 2011) (noting that we review findings of fact in a bench trial for clear error).

A party has a "duty to abstain from inducing another to enter into a contract through the use of fraudulent misrepresentations." *Formosa Plastics Corp. USA v. Presidio Eng. & Contractors, Inc.*, 960 S.W.2d 41, 49 (Tex. 1998). As a general rule, a failure to disclose information does not constitute fraud unless there is a duty to disclose the information. *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001) (citation omitted). But when there is a duty to disclose information and a party fails to do so, the omission is tantamount to an affirmative misrepresentation of the facts. *See Myre v. Meletio*, 307 S.W.3d

No. 17-20014

839, 843 (Tex. App.—Dallas 2010, pet. denied).  This fraud by omission occurs when:

> (1) when a defendant conceals or fails to disclose a material fact within his knowledge; (2) the defendant knows the plaintiff is ignorant of the fact and does not have an equal opportunity to discover the truth; (3) the defendant intends to induce the plaintiff to take some action by concealing or failing to disclose the fact; and (4) the plaintiff suffers injury as a result of acting without knowledge of the undisclosed fact.

*Holland v. Thompson*, 338 S.W.3d 586, 597 (Tex. App.—El Paso 2010, pet. denied).

Jeffrey first contends that he did not have a duty to disclose Electrical's payroll tax liability before the execution of the agreement.  But such a duty arises when a fiduciary relationship exists between parties.  *Holland*, 338 S.W.3d at 598.  Jeffrey concedes that he was an officer and Vice President at Electrical.  As an officer, he owed a fiduciary duty to the company.  *See Lifshutz v. Lifshutz*, 199 S.W.3d 9, 18 (Tex. App.—San Antonio 2006, pet. denied) ("Corporate officers owe fiduciary duties to the corporations they serve.").  He therefore had a duty to disclose[2] the unpaid payroll tax liability to Electrical, which was owned by Shirley and Roger.

Jeffrey next argues that there was no evidence that he knew about the unpaid payroll taxes before the sale.  During that time, Jeffrey was managing Electrical and controlling its operations.  He hired Roy Johnson to serve as Electrical's CFO.  In April or May 2008, CPA Arthur—whom Jeffrey and Johnson hired to review and audit Electrical's financial records—discovered

---

[2] Jeffrey also maintains that his company, Services, should not be held accountable because it did not owe Shirley, Roger, or Electrical a fiduciary duty.  But agency principles indicate otherwise.  *Elliot v. Tilton*, 89 F.3d 260, 264 (5th Cir. 1996).  In any event, we do not need to decide this question as Jeffrey's conduct alone would support the rescission remedy that is all we find appropriate.

7

that the company had likely not paid its payroll taxes. When asked whether he had talked to Jeffrey and Johnson about his discovery, Arthur testified "I had verbally talked to them a couple of times, and I think there was probably an e-mail where I listed the amount." It turns out the email sent before the sale that lists the amount was not sent to Jeffrey (one sent after the sale was), but that does not necessarily undermine Arthur's testimony that he also twice discussed the problem (as opposed to the exact amount) with Jeffrey. Indeed, the direct testimony of a single witness, and Arthur was a key one, is enough to prove a fact if the factfinder finds the testimony credible. *See H & H, LLC v. CWI-White Oaks Landfill, LLC*, 212 F. App'x 309, 311 (5th Cir. 2007); FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS (CIVIL) § 3.4 (2014); *cf. United States v. Bowen*, 818 F.3d 179, 186 (5th Cir. 2016) (recognizing that, even in criminal cases which have a much higher burden of proof, the testimony of a single, uncorroborated coconspirator who may receive a benefit from cooperation is enough to support a verdict unless that testimony is deemed "incredible").

Additional evidence corroborates Arthur's testimony that he told Jeffrey about the tax problem. Jeffrey knew the quarterly payroll tax returns had not been filed. Recall that when his mother heard about the failure to file, he told her he was taking care of it. A failure to file does not necessarily mean that the payroll taxes had not been forwarded to the IRS—as with income taxes, the returns determine the final liability and settle up the account by either requiring an additional payment to the IRS or giving the taxpayer a refund—but one inference to be drawn from it is that there is also a problem with the payments themselves. In other words, although a failure to file the returns could just be an oversight, it could also be an indication that the company owed money and did not want to pay it as the return requires "settling up" and paying any outstanding amount. *See* IRS Form 941, Line 14 ("Balance due") & attached Form 941-V (Payment Voucher). The district court was entitled to

draw the latter conclusion, which also happens to be supported by what ended up being the case: the company had failed to forward hundreds of thousands in payroll taxes taken from employees checks during 2007 and stopped forwarding any funds during 2008.

Further supporting this view is that the notice that returns had not been filed led Arthur to ask Jeffrey for a power of attorney to obtain prior returns so he could determine "all of 2007 tax deposits received by the IRS."  This letter indicates Jeffrey knew not just about the failure to file, but also that there was a problem with the money being forwarded to the IRS.  If they believed that all 2007 tax deposits had been made, why ask the IRS for that payment information?  It also would make little sense for Arthur to ask Jeffrey for that power of attorney to help determine outstanding 2007 liability, but then hide from Jeffrey what Arthur already knew—that the company had not paid what it owed during 2008 and likely had also not paid everything due for 2007—or the results of the request Jeffrey authorized.  Finally, an email can be read as an instruction from Johnson to Arthur not to disclose the payroll tax liability to Shirley prior to the sale.  Who would benefit from keeping that information from Shirley?  Johnson had no apparent personal incentive to keep the information under wraps.  But the person who hired him, Jeffrey, did.  Not forwarding the payroll taxes made Electrical's balance sheet look much better than it actually was, which helped in securing the financing Jeffrey needed to purchase the assets.  A factfinder could thus conclude that someone higher up than Johnson was "in the know" and that person was Jeffrey in light of the evidence discussed and Shirley being kept in the dark.

There is a final piece of evidence that supports this view.  Johnson sent Arthur, Reed, and Jeffrey an email after the sale in early September stating "We need to really talk about how to handle [the tax owed] from a financial reporting perspective regarding the Wells Fargo."  Even though that email was

sent after the sale, its matter-of-fact discussion of the $1 million owed and Jeffrey's inclusion on the distribution list supports the view that this same group knew about the tax liability before the sale happened. There is nothing in the email, or any response to it, suggesting that the tax liability was being revealed to Jeffrey for the first time. We therefore conclude that even if a factfinder could have come out either way on this question, there was sufficient direct and circumstantial evidence of Jeffrey's knowledge to support the district court's finding.

Much of the evidence we have just pointed to also overcomes Jeffrey's objection to the district court's conclusion that Shirley did not have an equal opportunity to learn of the nonpayment. First and foremost, three days before the sale, Johnson directed Arthur not to tell Shirley about the tax problem "for now." Reed also never advised Shirley of the payroll liability during any of their weekly phone calls. That concealment would only be effective if Shirley did not have easy access to records revealing the problem. That Arthur sought Jeffrey's signature for the power of attorney also supports the testimony that he rather than Shirley was running the business at this time. And although Arthur asked Jeffrey to talk to his mother about the returns, he did not contact her. Instead, when she received an IRS notice that a return had not been filed, she immediately inquired with Jeffrey who told her that "everything was okay." In addition, the bank statements that revealed nonpayment of the payroll taxes were being sent to Channelview, not Arkansas where Shirley was during this time. The trial court did not clearly err when it found that Shirley did not have an equal opportunity to discover Electrical's outstanding payroll tax liability.

The final challenge to the liability ruling is Jeffrey's argument that his parents could not allege fraud when they themselves had unclean hands. The unclean hands argument relates to the parents' increasing Electrical's line of

credit by about half a million dollars days before the sales agreement closed (a liability that did transfer to Services).  But that transfer of funds was at issue in a separate lawsuit between these parties in Arkansas state court.  That case settled.  As part of the settlement, the parties agreed to dismiss most of Jeffrey's claims—breach of contract, fraud, and negligent misrepresentation— against his mother in this case.  As Jeffrey achieved a settlement in the other lawsuit based on these same allegations arising out of the increased line of credit, it would be double dipping to use the same conduct as a defense in this case.  The trial court thus did not abuse its discretion in ignoring this already resolved issue.  *See In re RONFIN Series C Bonds Sec. Interest Litigation*, 182 F.3d 366, 370–71 (5th Cir. 1999).

We find no error in the district court's determination that Jeffrey fraudulently induced the sale.

## IV.

An important question remains: what is the consequence of Jeffrey's fraudulent inducement of the sale?  In asserting the defense as a ground for summary judgment, the parents argued that a finding of fraudulent inducement would render the contract unenforceable.  *Bailey*, 584 F. App'x at 221.  That would mean unwinding the sale, in which case Electrical and the parents would get back the assets they were tricked into selling under false pretenses (they would have to give Jeffrey back the money he paid for those assets).  It would also mean they still owe the unpaid 2007 and 2008 payroll taxes as that was their obligation in the presale state of things.

The district court did not order that remedy.  Instead, it kept the sale in place—Jeffrey still had the assets, his parents still had the money he paid— but declared that Jeffrey and Services were responsible for Electrical's unpaid payroll tax liability.  That effectively reforms the contract, which the previous panel held did not transfer the tax liability to Jeffrey.  Reformation is not a

remedy for fraudulent inducement.[3] 27 WILLISTON ON CONTRACTS § 69:55 (4th ed.) ("[I]f the contract agreed upon is embodied in the writing, the fact that the agreement was induced by fraud is not ground for reformation.").  As a result, a judge does not have the power to make a contract to which the parties did not agree.  *Cherokee Water Co. v. Forderhause*, 741 S.W.2d 377, 379 (Tex. 1987); *Fawcett, Ltd. v. Idaho N. & Pac. R.R. Co.*, 293 S.W.3d 240, 251 (Tex. App.—Eastland 2009, pet. denied) ("Equity cannot be invoked to create a contract that the court considers should have been made but was not." (citations omitted)); *see also* Dan B. Dobbs, HANDBOOK ON THE LAW OF REMEDIES: DAMAGES-EQUITY-RESTITUTION § 9.5, 618 (1993).  A judge, or the parties for that matter, do not know what the effect of the withheld information would have been on the deal.

So rather than imposing on the parties never-agreed-on terms, the remedies for fraudulent inducement are either rescission of the contract or affirming the contract and recovering for damages flowing from the fraud. *Dallas Farm Machinery Co. v. Reaves*, 307 S.W.2d 233, 238–39 (Tex. 1957); *see also Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 676–77 (Tex. 2000). Electrical and the parents only asserted fraudulent inducement as a defense, never as a claim for affirmative relief, making rescission their only option. Indeed, that was the sole basis for our earlier remand: evaluation of the parents' argument that "the Agreement was unenforceable because Jeffrey Bailey induced it through fraud."  *Bailey*, 584 F. App'x at 220, 222.  With that

---

[3] Texas does allow reformation when there is a unilateral mistake coupled with fraudulent inducement or other inequitable conduct.  *Conn v. Hagan*, 55 S.W. 323, 325 (Tex. 1900); *Liu v. Yang*, 69 S.W.3d 225, 228–29 (Tex. App.—Corpus Christi 2001, no pet.); 4 William V. Dorsaneo, TEXAS LITIG. GUIDE, § 53.02(2)(b) (2017).  But as those cases recognize, fraudulent inducement does not automatically result in a mistake.  Moreover, neither Electrical nor the parents asserted unilateral mistake or sought reformation.  As our prior decision noted, they asserted fraudulent inducement only as a basis for rendering the contract unenforceable.

No. 17-20014

fraud now proven, we remand again for the limited purpose of allowing Electrical and the parents to elect whether to rescind the contract. All the remand should entail is Shirley and Roger's electing whether to rescind the contract based on the fraud. If they elect to do so, they get the assets back but return the sales proceeds.[4] If they do not elect rescission, the sale and contract remain in force. Either way the payroll taxes are their obligation.

* * *

We AFFIRM in part and VACATE in part the judgment of the district court and REMAND for further proceedings limited to entry of a judgment consistent with the election made on remand.

---

[4] If the parents elect rescission, putting the parties back in their presale position would require that Jeffrey return the assets in the unencumbered status in which he received them. To the extent he is not able to do that, the district court would be able to consider other equitable relief that would return the parties to their presale position.