# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 12-41177
c/w No. 13-40559

United States Court of Appeals
Fifth Circuit

**FILED**

June 25, 2014

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

v.

CRISTIAN ALEJANDRO RODRIGUEZ–LOPEZ, a/k/a Alex, a/k/a Puma, a/k/a Compadre,

Defendant–Appellant.

---------------------------------------------------------------------------------------------------------

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

v.

LUIS NARCISCO BARRON,

Defendant–Appellant.

Appeals from the United States District Court
for the Eastern District of Texas

No. 12-41177 c/w No. 13-40559

Before DAVIS, ELROD, and COSTA*, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

A jury in the Eastern District of Texas convicted Cristian Alejandro Rodriguez–Lopez and Luis Narcisco Barron (collectively, "defendants") of conspiring to distribute marijuana. The district court sentenced each defendant to a term of imprisonment. Rodriguez–Lopez argues on appeal that venue was improper in the Eastern District and that the evidence was insufficient to sustain the conviction. Rodriguez–Lopez also argues that the district court improperly calculated his offense level for sentencing purposes. Barron, in a separate appeal, argues that the evidence was insufficient and that the prosecutor made improper statements in closing arguments. Barron also challenges the calculation of his offense level. We consolidated the defendants' separate appeals. We affirm Rodriguez–Lopez's conviction and sentence. We also affirm Barron's conviction. We vacate Barron's sentence, however, and remand for resentencing.

I.

This case arose out of two federal law enforcement investigations: one focused on illegal drug trafficking and the other on illegal firearms trafficking.[1] The drug trafficking organization, headed by Nazario Cavazos, moved marijuana across the border between Mexico and the United States, near Laredo, Texas. Jose Arce, who was part of the organization and testified at

---

* Judge Costa participated by designation in this case as a United States District Judge for the Southern District of Texas. Since that time, he has been appointed as a Fifth Circuit Judge.

[1] We present the facts in the light most favorable to the conviction as we must. *See United States v. Thomas*, 690 F.3d 358, 366 (5th Cir. 2012).

No. 12-41177 c/w No. 13-40559

trial, managed border crossings. Arce testified that from 2002 to 2006 he moved more than 100 tons of marijuana for the Cavazos organization, from Laredo to Dallas, Atlanta, New York, and other cities. Federico Garcia testified that from 2004 to 2006 he transported marijuana for the Cavazos organization by land through Texarkana, Texas, and Beaumont, Texas, in order to reach other cities in the interior of the United States.

Brothers Roberto and Erasmo Marquez ran a cell of the Cavazos organization in north Texas. Roberto Marquez communicated directly with Cavazos. The Marquez cell used three interrelated stash houses, on three nearby streets known as Charlestown, Jamestown, and Brookstown. In 2007 and 2008, Rodriguez–Lopez, also known as "Puma," lived in, and was named on the lease for, the Brookstown house. According to two other individuals involved in the operation, Jesus Marquez (brother to Roberto and Erasmo) and Cesar Morales, Rodriguez–Lopez lived rent-free in exchange for his drug-distribution services. Jesus Marquez described the fundamentals of each house thus:

> [The marijuana] comes in during the night, truck comes in, they open the garage and they unload, truck takes off, they weigh the marijuana, turn it into 50 pounds, taking off the wrapping around it, weigh it, turn it into 50, wrap it back up, and then they start choosing who is gonna get what to sell.

Jesus Marquez also testified that Rodriguez–Lopez, who was married to the Marquez brothers' niece, was Roberto Marquez's "right hand" man. Accordingly, Rodriguez–Lopez would get his choice of marijuana to sell. As a man of high status, Rodriguez–Lopez also had the ability within the cell to "tell other people what to do." Rodriguez–Lopez kept a rusty Berretta handgun for protection, given the danger associated with such large quantities of marijuana. After Rodriguez–Lopez and the others had distributed the

marijuana, a man known as "Commandante" would collect the profits, on Cavazos's behalf, from each of the stash houses.

Twice federal agents seized Cavazos organization trucks that were carrying marijuana, once in 2005 in Tyler, Texas, and once in 2006 in Dallas. On June 11, 2008, federal agents executed search warrants at each of the Dallas stash houses. Rodriguez–Lopez was at home at the Brookstown house, where the agents recovered: drug ledgers (including one ledger entitled "Notas de Puma"), a receipt for plastic wrapping, packaging materials, a small amount of marijuana, digital scales, over $47,000 in cash, a money counter, two firearms (including a rusty Berretta), and body armor. At the Jamestown house, the agents seized: drug ledgers, 1,000 pounds of marijuana, packaging materials, other narcotics paraphernalia, two firearms, and over $247,000 in cash. And at the Charlestown house, the agents found: drug ledgers, 35 pounds of marijuana, digital scales, one firearm, Roberto Marquez's passport, and over $1,000,000 in cash.

The drug ledgers at each house contained information about the Marquez cell's inventory. Rodriguez–Lopez's personal accounts in the ledgers for the three houses reflected more than 5,000 pounds of inventory; the separate "Notas de Puma" ledger reflected another 2,000 pounds. An FBI forensics specialist examined the ledgers and testified that between September 28, 2007, and May 7, 2008, the marijuana inventory for the Brookstown, Jamestown, and Charlestown houses amounted to approximately 138,000 pounds. The specialist also testified that the Brookstown house distributed to forty-seven different accounts from January 2004 to November 2007.

The United States linked Barron to the Cavazos organization through firearms transactions. As part of an investigation into the Mexican drug cartels' supply of firearms, federal agents learned that Barron's cousin,

No. 12-41177 c/w No. 13-40559

Roberto Flores, was acting as a straw buyer for Barron. The agents convinced Flores to cooperate, and from 2006 until 2008 Flores helped gather evidence of Barron's firearms trafficking business by continuing to engage in firearms transactions on behalf of Barron—often while wearing a wire. The testimony at trial further revealed that, prior to Flores's cooperation, Oscar Gomez, one of Cavazos's closest lieutenants, approached Barron at Cavazos's request in 2005. Cavazos had given Barron's phone number to Gomez. Cavazos needed the firearms to protect his business—various Mexican drug cartels were at war. After Barron and Gomez agreed on a purchase price for military-style weapons, Cavazos signed off on the deal. Barron took the firearms to the border, and Cavazos's men then smuggled the firearms into Mexico. Barron and Gomez's relationship continued: On at least three subsequent occasions, following meetings near Dallas, Gomez purchased firearms from Barron, paying Barron approximately $10,000 (in drug proceeds) each time. Gomez also went to Barron for firearms troubleshooting. Cavazos himself apparently experienced some "jamming" issues with the firearms at one point, prompting Gomez to seek help from Barron, who obliged. Barron knew that Gomez was in the drug business. The two spoke openly to each other about their careers. Barron even inquired into buying some marijuana from Gomez to sell on his own, but that transaction never came to fruition.

Based on the foregoing, a grand jury returned a five-count indictment, naming twenty-three defendants. Pertinent here, Rodriguez–Lopez and Barron[2] were named in Count One (conspiracy to distribute 1,000 kilograms

---

[2] Barron also was named in Count Three (possession of an unregistered machine gun, in violation of 26 U.S.C. §§ 5841 and 5861(d) and 5871), Count Four (possession of an illegal machine gun, in violation of 18 U.S.C. § 922(o) and 924(a)(2)), and Count Five (dealing in firearms without a license, in violation of 18 U.S.C. § 922(a)(1)(A) and 923(a) and 924 (a)(1)(D)). After voir dire but prior to opening statements, Barron pleaded guilty to the

No. 12-41177 c/w No. 13-40559

or more of marijuana, in violation of 21 U.S.C. §§ 841(a), (b)(1)(A)(vii) and 846).[3]

Only three defendants, including Rodriguez–Lopez and Barron, went to trial, where the above-described facts unfolded.[4]   When the United States rested, one defendant made a joint motion for acquittal, which was adopted by the other two:

> We'll ask for a judgment of acquittal, a Rule 29 motion.   The government, having the burden of proof, it's our opinion at this point hasn't put on any evidence beyond a reasonable doubt that should go to a jury that my client is involved in a conspiracy, that he has distributed drugs as charged in the indictment, Your Honor.

The district court denied the motions as to the marijuana conspiracy.

In closing arguments, in an effort to demonstrate that he "g[o]t it" and that he was "all for backing the blue," defense counsel for Barron commented that his "dad was an FBI agent" and that he had been "a state and federal prosecutor" and "an elected trial judge for four years."   The Assistant U.S. Attorney then argued on rebuttal, attempting to show motive and apparently partially responding to defense counsel's rhetoric:   "Why does someone sell drugs?   Why does someone sell firearms on an illegal market?   Why does someone leave the U.S. Attorney's Office and lend their credibility to representing drug traffickers and firearms dealers?"   Pursuant to an objection,

---

firearms counts.   Those convictions and the accompanying sentences are not at issue on appeal.

[3] In addition, the indictment alleged, in the disjunctive, that the defendants also conspired to distribute cocaine, methamphetamine, and "ecstacy."   The district court granted the defendants' motions for acquittal as to cocaine, methamphetamine, and ecstacy.

[4] A third defendant, Daniel Galvan–Rodriguez, was tried and convicted along with Rodriguez–Lopez and Barron.   Galvan–Rodriguez was subsequently sentenced to 168 months in prison on Count One and did not to appeal.

the district court immediately instructed the jury to disregard that statement, explaining that the statement was "totally improper." The district court informed the jury that Barron's defense counsel "ha[d] every right to represent a criminal defendant" and that "everyone has a right to a defense."[5]

The defendants were convicted of conspiring to distribute marijuana. The jury also answered a special interrogatory, finding that as to each defendant the "quantity of marijuana" involved in the conspiracy was more than 1,000 kilograms. The district court instructed the jury that a "quantity of marijuana may only be attributed to the defendant if that quantity was within the scope of the conspiracy after the defendant's entry into the conspiracy and if the defendant knew or should have known that that quantity of marijuana was involved in the conspiracy."

Approximately twelve days after the jury returned its verdict, Barron filed a motion for a new trial based on the prosecutor's comments on rebuttal. The district court denied the motion in a written order, concluding that Barron's substantial rights were not affected.

At Rodriguez–Lopez's sentencing hearing, the district court calculated Rodriguez–Lopez's base offense level to be 38. To arrive at that number, the district court found—over Rodriguez–Lopez's objection—that Rodriguez–Lopez was responsible for more than 30,000 kilograms (i.e., approximately more than 66,000 pounds) of marijuana. *See* U.S.S.G. §§ 1B1.3(a)(1)(B) and 2D1.1(c)(1). Then, after applying several adjustments not at issue on appeal, the district court announced that Rodriguez–Lopez's total offense level was 41 and that his criminal history category was II. Concluding that Rodriguez–

---

[5] The jury instructions also included this standard instruction: "Remember that any statements, objections, or arguments made by the lawyers are not evidence. . . . [I]t is your own recollection and interpretation of the evidence that controls in this case."

Lopez's Guidelines range was 324 months to 405 months in prison, the district court sentenced Rodriguez–Lopez at the low end, to 324 months in prison.[6]

The district court later sentenced Barron. At the sentencing hearing, the district court concluded that Barron's base offense level was 32, finding that Barron was responsible for more than 1,000 kilograms but less than 3,000 kilograms (i.e., approximately between 2,000 and 7,000 pounds) of marijuana. *See* §§ 1B1.3(a)(1)(B) and 2D1.1(c)(4). The district court relied on the jury's answer to the special interrogatory for that finding. Relevant here, the district court also applied a three-level increase for Barron's managerial or supervisory role in the drug conspiracy. *See* U.S.S.G. § 3B1.1(b). Barron objected to both the base offense level and the enhancement. The district court overruled Barron's objections and arrived at a total offense level of 37 and a criminal history category of I. Observing that Barron's Guidelines range on Count One was 210 months to 262 months in prison, the district court sentenced Barron at the low end, to 216 months in prison.

## II.

The defendants raise a number of issues on appeal, some of which overlap and some of which are entirely separate. We will address each defendant's case in turn, beginning with Rodriguez–Lopez.

### A.

### 1.

Rodriguez–Lopez argues that venue was improper in the Eastern District of Texas. The United States Constitution enshrines a defendant's right to be tried in the district "wherein the crime shall have been committed."

---

[6] The district court miscalculated the Guidelines range, which resulted in a windfall for Rodriguez–Lopez. A total offense level of 41 and a criminal history category of II provides for a Guidelines range of 360 months to life in prison.

U.S. Const. amend VI; *see also* U.S. Const. art. III, § 2, cl. 3; Fed. R. Crim. P. 18. Venue is proper in conspiracy cases in any district where the agreement was formed or an overt act occurred. *United States v. Winship*, 724 F.2d 1116, 1125 (5th Cir. 1984). A defendant must assert a challenge to venue prior to trial if the indictment or circumstances known to the defendant make such a challenge apparent. *United States v. Carreon–Palacio*, 267 F.3d 381, 392 (5th Cir. 2001). If a venue challenge is not apparent before trial, a defendant must bring a claim of improper venue to the district court's attention at the close of the United States' evidence. *Id.* at 393. A defendant waives his right to contest venue on appeal, however, when his motion for acquittal fails to put the court and the United States on notice of the challenge to venue. *United States v. Carbajal*, 290 F.3d 277, 288–89 n.19 (5th Cir. 2002) (citing *Carreon–Palacio*, 267 F.3d at 391–92).

Here, in his motion for acquittal, Rodriguez–Lopez argued that the United States had not put on evidence to prove his guilt beyond a reasonable doubt; he did not mention venue. This motion was therefore too vague to put the district court and the United States on notice of a venue challenge. *See Carbajal*, 290 F.3d at 288–89 n.19 (holding that merely arguing that the United States did not sufficiently prove the defendant's guilt was inadequate to put the district court or the United States on notice that the defendant was challenging venue). We consider the challenge waived.

Even assuming *arguendo* that Rodriguez–Lopez did not waive his challenge, we conclude that venue was proper in the Eastern District of Texas. The United States must prove venue by a preponderance of the evidence. *United States v. Thomas*, 690 F.3d 358, 368 (5th Cir. 2012). Rodriguez–Lopez appears to be under the mistaken assumption that, because his actions took place in Dallas (in the Northern District of Texas), the Northern District of

No. 12-41177 c/w No. 13-40559

Texas is the only place in which venue would be proper. On the contrary, "[v]enue is proper in conspiracy offenses in any district where the agreement was formed or an overt act occurred." *Winship*, 724 F.2d at 1125. Venue may be proper in districts in which conspirators "have never set foot." *Id.* (citing *Hyde v. United States,* 224 U.S. 357 (1912), and *United States v. DeLeon*, 641 F.2d 330, 336 (5th Cir. 1981)). A conspirator is liable for "all acts committed by [co-conspirators] in furtherance of the conspiracy, including those acts committed without his knowledge before he joined the conspiracy." *United States v. Marrionneaux*, 514 F.2d 1244, 1250 (5th Cir. 1975), *abrogated on other grounds by United States v. Lane*, 474 U.S. 438, (1986). The United States' evidence reflected that co-conspirator Garcia hauled drugs through Beaumont and Texarkana and that federal agents seized one of the Cavazos organization's cargo trucks in Tyler. All three cities are in the Eastern District of Texas. *See United States v. Garcia Mendoza*, 587 F.3d 682, 687 (5th Cir. 2009) ("[O]ne co-conspirator's travel through a judicial district in furtherance of the crime alleged establishes venue as to all co-conspirators."). Therefore, a rational jury could conclude by a preponderance of the evidence that venue was proper in the Eastern District of Texas.

2.

Turning to the sufficiency of the evidence, we review the district court's denial of Rodriguez–Lopez's motion for acquittal *de novo. United States v. Cervantes*, 706 F.3d 603, 617 (5th Cir. 2013). We must affirm a conviction if, after viewing the evidence and all reasonable inferences in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

To establish Rodriguez–Lopez's guilt, the United States was required to prove that: (1) two or more persons agreed to distribute marijuana; (2) Rodriguez–Lopez knew of the existence of the agreement; and (3) Rodriguez–Lopez voluntarily participated in the conspiracy. *See Cervantes*, 706 F.3d at 617. Because the United States sought an enhanced penalty based on the amount of drugs (i.e., under § 841(b)(1)(A)(vii), which requires that the conspiracy involve at least 1,000 kilograms of marijuana), the United States was required to prove beyond a reasonable doubt the amount of marijuana alleged to be involved in the conspiracy. *See Apprendi v. New Jersey*, 530 U.S. 466 (2000).

It is true, as Rodriguez–Lopez points out, that the United States "may not prove up a conspiracy merely by presenting evidence placing the defendant in a climate of activity that reeks of something foul." *United States v. Mendoza*, 226 F.3d 340, 343 (5th Cir. 2000) (internal quotation marks omitted). But the evidence at trial reflected that Rodriguez–Lopez was involved actively in the "something foul" here; he was not an innocent bystander. To begin with, Rodriguez–Lopez lived in one of the primary stash houses. A rational jury could have believed Jesus Marquez and Cesar Morales and concluded that Rodriguez–Lopez lived in the house rent-free not out of the kindness of the Marquez brothers' hearts but because he played a valuable role in the drug conspiracy. This role was memorialized in the drug ledgers, which reflected that Rodriguez–Lopez, or "Puma," was personally responsible for moving at least 7,000 pounds of marijuana. Indeed, according to Jesus Marquez, Rodriguez–Lopez, as Roberto Marquez's "right hand" man, had his choice of

No. 12-41177 c/w No. 13-40559

marijuana to sell.[7]  The district court was correct to deny the motion for acquittal, and we therefore affirm the jury's verdict as to Rodriguez–Lopez, including its answer to the special interrogatory.

3.

Rodriguez–Lopez also challenges his sentence on the ground that the district court's finding that he was responsible for more than 30,000 kilograms of marijuana—more than the jury found in answering the special interrogatory—violated *United States v. Booker*, 543 U.S. 220 (2005).  We review for plain error because Rodriguez–Lopez did not object on this ground. *United States v. Arnold*, 416 F.3d 349, 362 (5th Cir. 2005).

No error, plain or otherwise, under *Booker* and its progeny occurred here. The district court's finding that Rodriguez–Lopez was responsible for more than 30,000 kilograms did not increase the statutory maximum or minimum as set by the jury's answer to the special interrogatory.  Rodriguez–Lopez was convicted under §§ 841(a)(1), (b)(1)(A)(vii) and 846.  Therefore, the minimum sentence provided by statute was ten years; the maximum, life in prison.  The district court lawfully calculated a Guidelines sentence based on its own factual findings, which were not erroneous given Rodriguez–Lopez's role in the

---

[7] Rodriguez–Lopez protests that much of the information implicating him in the conspiracy was relayed by co-conspirators.  "A defendant may be convicted on the uncorroborated testimony of a coconspirator who has accepted a plea bargain unless the coconspirator's testimony is incredible." *United States v. Valdez*, 453 F.3d 252, 257 (5th Cir. 2006) (alteration and internal quotation marks omitted).  "Testimony is incredible as a matter of law only if it relates to facts that the witness could not possibly have observed or to events which could not have occurred under the laws of nature." *Id.* (internal quotation marks omitted).  Beyond bald assertions regarding the co-conspirators' drug habits and motives to shift blame, Rodriguez–Lopez fails to explain how or why the co-conspirators' testimony was "incredible as a matter of law." *See id.*  The jury was well-instructed on the importance of assessing with caution the testimony of an accomplice or a drug user.  A rational jury was entitled to rely on that testimony.

No. 12-41177 c/w No. 13-40559

Marquez cell of the Cavazos organization. *See United States v. Akins*, 746 F.3d 590, 613 (5th Cir. 2014) ("The judge's finding that [the defendant] was responsible for more than 300 grams of crack cocaine did not increase the maximum or the minimum penalty to which [the defendant] could be subjected based on the jury's findings . . . . The judge simply calculated an intermediate advisory Guidelines range based on his own findings, as permitted by *Booker* and its progeny."). Accordingly, we affirm the judgment as to Rodriguez–Lopez.

B.

1.

We now turn to Barron's sufficiency challenge, which we review *de novo*, under *Jackson*, 443 U.S. 307. The United States argued at trial that Barron aided and abetted the Cavazos organization conspiracy, and the jury was instructed on that theory. To prove that Barron aided and abetted the conspiracy, the United States was required to prove that: (1) the offense of conspiracy occurred and (2) Barron associated himself with the venture, participated in it as something he wished to bring about, and sought by his action to make it succeed. *United States v. McDowell*, 498 F.3d 308, 313 (5th Cir. 2007); *see also United States v. Segura*, 122 F. App'x 768, 777 (5th Cir. 2005) (upholding conviction for aiding and abetting a drug conspiracy).

Barron's guilt, as demonstrated at trial, was of a different sort than Rodriguez–Lopez's. The United States does not contend that Barron was moving, packaging, or selling marijuana for the Cavazos organization, and Barron frankly concedes that the United States "unquestionably proved the existence of a conspiracy to distribute marijuana." Barron argues instead that the evidence of his knowledge of and participation in the conspiracy was insufficient. Barron relies heavily on the fact that the surveillance recordings

13

(obtained via Flores) were devoid of any explicit mention of the Brookstown, Jamestown, or Charlestown houses or the Cavazos organization. Barron also observes that, according to Gomez's testimony, Gomez never told Barron that he was purchasing the firearms on behalf of the Cavazos organization.

We begin with Barron's knowledge of the conspiracy.[8] Although Gomez did not testify that he invoked the Cavazos name in his dealings with Barron, a rational jury could infer that Barron was aware of Gomez's connection to the Cavazos organization. The evidence also demonstrated that Barron delivered the firearms to members of the Cavazos organization at the border, in accordance with his agreement with Gomez. Moreover, Barron knew that his firearms trafficking business was illegal, a fact that would allow a rational jury to conclude that Barron also knew that he was dealing with a similarly illicit organization.

Barron's association with and participation in the conspiracy is exemplified by the firearms transactions themselves. There are many different roles that participants in a drug conspiracy may play—for example, "supervisor and manager," "distributor," "payment collector," "gunman and enforcer," and "firearms procurer and storer." *See United States v. Tolliver*, 61 F.3d 1189, 1196–97 (5th Cir. 1995), *vacated on other grounds*, *Moore v. United States*, 519 U.S. 802 (1996). In the drug business, firearms are necessary assets, and the jury could have found that Barron knowingly provided those necessary assets to Cavazos organization members and delivered them at the border so that the organization could protect its valuable marijuana.

---

[8] The jury was instructed on *actual knowledge* only, so this appeal does not require us to consider whether the evidence supported a deliberate indifference instruction.

14

No. 12-41177 c/w No. 13-40559

The illegal nature of the firearms trafficking in which Barron was engaged also supports the jury's conclusion.  Barron was not an unknowing seller who made a one-off sale.  As we explained in *United States v. Michelena–Orovio*, a defendant who has supplied "'innocent'" goods to people who intend to use those goods unlawfully—without more—has not committed a crime.  719 F.2d 738, 748–49 (5th Cir. 1983) (quoting *United States v. Falcone*, 311 U.S. 205 (1940) (evidence insufficient to support convictions of aiding and abetting a conspiracy to distill spirits where defendants knowingly supplied a large volume of sugar and yeast to illegal distillers)).  But the unlawfulness of the goods themselves is "important in terms of both the seller's *knowledge* of the buyer's intended use, and the seller's *intent* to promote and cooperate in the illegal action." *Michelena–Orovio*, 719 F.2d at 749.  In light of the foregoing, and with more than sufficient evidence to establish that the overall scope of the conspiracy involved more than 1,000 kilograms of marijuana, we will not second guess the jury's determination that Barron was guilty of conspiring to distribute marijuana, including the finding on the special interrogatory.

2.

Barron argues that his conviction should be vacated because his right to a fair trial was compromised by the prosecutor's improper remarks during closing arguments.  We review the district court's denial of Barron's motion for a new trial for abuse of discretion.  *United States v. Wyly*, 193 F.3d 289, 298 (5th Cir. 1999).  We apply a two-step analysis to claims of prosecutorial misconduct:  First, we assess whether the prosecutor made an improper remark.  If so, we determine whether the defendant was prejudiced—a "high bar." *United States v. Davis*, 609 F.3d 663, 677 (5th Cir. 2010) (internal quotation marks omitted).  The prejudice prong turns on whether the prosecutor's remarks "cast serious doubt on the correctness of the jury's

15

verdict." *Id.* (internal quotation marks omitted).  We look to three factors in deciding whether the improper remarks "cast serious doubt":  "(1) the magnitude of the prejudicial effect of the prosecutor's remarks, (2) the efficacy of any cautionary instruction by the judge, and (3) the strength of the evidence supporting the conviction." *Id.* (internal quotation marks omitted).

We agree with Barron that the prosecutor's comments were improper. We have repeatedly chastised federal prosecutors for making improper remarks in closing arguments—for example, for "bolstering" federal agents' credibility in closing arguments, *see United States v. Aguilar*, 645 F.3d 319, 324 (5th Cir. 2011) ("The prosecutor in this case, in a rapid series of comments, referred to the agents' positions as government agents, then said it would be alarming if they were lying, they were just doing their jobs, and they strive to be ethical."); for attacking the character of the defendant, *see United States v. Jefferson*, 432 F. App'x 382, 390 (5th Cir. 2011) ("The prosecutor also engaged in an improper argument when he said that [the defendant] had reached 'the all time new low for criminal defense 101' by blaming his dead mother for the crime.  A prosecutor should not use closing argument to demean the character of the defendant for reasons other than the crime for which he is on trial."); and for attacking the character of defense counsel, *see United States v. Murrah*, 888 F.2d 24, 27 (5th Cir. 1989) ("No counsel is to throw verbal rocks at opposing counsel."); *United States v. Jones*, 839 F.2d 1041, 1049 (5th Cir. 1988) ("During his closing argument, [the prosecutor commented:]  'Out of an absolute act of desperation, as a final grasp of hope in trying to get you to buy their various distorted defenses, [the defense attorneys] sponsor perjury.  They bring you a lie.' . . .  [U]nder our cases the comment was reprehensible.").  We view the remarks here with as much or perhaps even greater opprobrium.  Disparaging defense counsel's motives for representing a criminal defendant is a foul blow.

*See Berger v. United States*, 295 U.S. 78, 88 (1935) ("[The United States Attorney] may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones."). There is no place in federal court for such conduct.

Having concluded that the remarks were improper, we must determine whether Barron was prejudiced by them. Mindful that a prosecutor's improper remark "carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence," *United States v. Young*, 470 U.S. 1, 18–19 (1985), we nevertheless conclude that vacating Barron's conviction is not warranted. We emphasize that here the district court was quick to admonish the misconduct, not only immediately sustaining defense counsel's objection but also verbally instructing the jury as to why the remarks were improper.[9] The district court's prompt actions and curative instructions, we conclude, were therefore effective. In addition, we have already explained the strength of the evidence against Barron, a factor weighing against Barron's entitlement to a new trial. Accordingly, although we strongly condemn the prosecutor's remarks, we conclude that those remarks did not "cast serious doubt" on the verdict. *See Davis*, 609 F.3d at 677. The district court did not abuse its discretion in denying Barron's motion for a new trial.

---

[9] Barron cites *United States v. Holmes*, 413 F.3d 770 (8th Cir. 2005), in support. There, the Eighth Circuit concluded that the prosecutor had made a series of improper remarks about defense counsel. *Id.* at 775. The Eighth Circuit held that a new trial was warranted. *Id.* at 777. That decision, however, rested in large part on the fact that the district court had overruled defense counsel's objection and had not given a curative instruction. *Id.* at 775–76. Moreover, the Eighth Circuit explained that the new trial was warranted in light of the improper remarks *in conjunction with* the improper exclusion of testimony favorable to the defense. *Id.* at 776–77. *Holmes* is unavailing.

No. 12-41177 c/w No. 13-40559

3.

Barron argues that the district court erred in setting his base offense level at 32 and in applying a three-level enhancement for his managerial or supervisory role in the drug conspiracy.  We review the district court's interpretation and application of the Sentencing Guidelines *de novo* and its factual findings for clear error.  *United States v. Miller*, 607 F.3d 144, 147 (5th Cir. 2010).  Both the determination regarding the relevant quantity of drugs for purposes of § 2D1.1(c)(4) and Barron's status as a manager or supervisor for purposes of § 3B1.1(b) are factual findings that we review for clear error. *See United States v. Alaniz*, 726 F.3d 586, 622 (5th Cir. 2013) (manager or supervisor); *United States v. Garza*, 541 F.3d 290, 292 (5th Cir. 2008) (drug quantity); *see also United States v. Cisneros–Gutierrez*, 517 F.3d 751, 764 (5th Cir. 2008) (explaining that there is no clear error if the finding is plausible in light of the record as a whole).

Under § 1B1.3(a)(1)(A), a district court must determine the base offense level for a conspiracy by reference to "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity[] that occurred during the commission of the offense."  Here, following a lengthy dialogue with defense counsel, the district court reasoned that Barron's involvement in the conspiracy rendered it "reasonably foreseeable" to Barron that the Cavazos organization was moving more than 1,000 kilograms of marijuana.  Especially in light of the jury's answer to the special interrogatory, which was in essence a finding of "reasonable foreseeability" beyond a reasonable doubt, we conclude that the district court did not clearly err.

The three-level enhancement at issue here applies "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive."

18

§ 3B1.1(b).[10] The role enhancement consists of two elements: (1) the defendant exercised managerial control over one or more of the other participants in the offense and (2) the offense involved five or more participants. *See* § 3B1.1 cmt. n.2. There is no dispute as to the satisfaction of the second element. As to the first element, we have referred to the following factors in determining whether the enhancement should apply: "the defendant's participation in planning, recruitment of accomplices, and exercise of control and authority over others." *United States v. Reagan*, 725 F.3d 471, 494 (5th Cir. 2013) (citing § 3B1.1 cmt. n.4).

The district court provided the following reasoning in support of its decision to apply the enhancement:

> He was found guilty of the drug conspiracy. He's supplying guns to those who conspired with him to distribute marijuana. And if he supplied them—let's see, he recruited Roberto Flores to purchase firearms, then Flores turns around and recruits other people, and there are recorded conversations where Mr. Barron is talking about the people Flores recruited and how to pay the straw buyers, and that the straw buyers shouldn't buy too many guns at once because somebody would become suspicious.
>
> . . . .
>
> The point is, he is paying Flores to recruit people to buy guns, and that assists the drug-trafficking organization.

Along similar lines, the United States argues on appeal that Barron's role in the Cavazos organization was significant because he "recruited Flores and others to get firearms and directed their activity." As defense counsel pointed out at the sentencing hearing, however, there was no evidence that Barron was

---

[10] The Presentence Report grouped the drug conspiracy separately from the firearms offenses to which Barron pleaded guilty. That determination, which no party challenges, means that the role enhancement relates to Barron's role in the drug conspiracy, not the firearms trafficking. *See United States v. Kleinebreil*, 966 F.2d 945, 955 (5th Cir. 1992).

No. 12-41177 c/w No. 13-40559

using Flores or any other Cavazos organization member as a straw buyer during the time that Barron was dealing with Gomez. There is thus no evidence that Barron recruited others to join the Cavazos organization conspiracy, and there is no evidence that Barron exercised control over others involved with the conspiracy. The United States does not argue to the contrary. Moreover, there is no evidence that Barron was involved in planning the operations of the Cavazos organization conspiracy. Therefore, although the leadership enhancement might have been appropriate for the firearms counts, which are not at issue on appeal, there is no evidence that Barron exercised any managerial or supervisory control over any of the participants in the Cavazos organization conspiracy. *See United States v. Lewis*, 476 F.3d 369, 390 (5th Cir. 2007) (district court clearly erred where there was no evidence that the defendant "was managing others" in a methamphetamine conspiracy); *see also United States v. Cisneros*, 414 F. App'x 696, 703 (5th Cir. 2011) (district court clearly erred where there was "no evidence in the record that [the defendant] took on a supervisory role, *e.g.* finding the driver, obtaining use of the [drug production location], spearheading the drug deal, or having some sort of authority over the other participants"). We conclude that the district court's findings were clearly erroneous and that therefore the enhancement should not apply.

## III.

We therefore AFFIRM Rodriguez–Lopez's conviction and sentence on Count One. We also AFFIRM Barron's conviction on Count One. We VACATE Barron's sentence on Count One and REMAND for resentencing.