# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-40654

United States Court of Appeals
Fifth Circuit

**FILED**

March 29, 2016

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

v.

TIMOTHY LEDON BOWEN; JUAN CARLOS VEGA; RENE CORTEZ SALAZAR,

Defendants–Appellants.

Appeals from the United States District Court
for the Eastern District of Texas

Before HIGGINBOTHAM, OWEN, and ELROD, Circuit Judges.

PER CURIAM:

Appellants Timothy Bowen, Juan Vega, and Rene Salazar were convicted of conspiring to possess with intent to distribute methamphetamine in violation of 21 U.S.C. § 846. Appellants challenge various aspects of their convictions, and Bowen also challenges his sentence. Because we find no reversible error in Appellants' convictions or Bowen's sentence, we AFFIRM.

## I.

Appellants Bowen, Vega, and Salazar, along with thirty-one other co-defendants, were indicted by a federal grand jury for conspiracy to possess with intent to distribute 50 grams or more of methamphetamine or 500 grams or more of a mixture or substance containing methamphetamine in violation of

No. 14-40654

21 U.S.C. § 846.  *See* 21 U.S.C. § 841(a), (b)(1)(A)(viii).  The relevant evidence at trial was as follows.[1]

In 2011, local police in the Denison/Sherman area of Texas requested assistance from the DEA in investigating suspected methamphetamine distribution activity between Dallas and the Denison/Sherman area.  DEA agent Henry Mata was assigned to the investigation.  The investigation initially focused on the Camacho siblings (Manuel, Paul, and Priscilla) in Dallas who sold methamphetamine to distributors in the Denison/Sherman area.  Paul Camacho led investigators to Andy Nguyen, who was the source of the Camachos' supply.  Nguyen testified that he worked for a supplier in Mexico named "Primo" and sold methamphetamine to the Camachos.

Primo used a carrier named Ramiro Cazares to deliver drugs and drug proceeds from Mexico to Nguyen's workers in Dallas.  One of Nguyen's workers, Manuel Urbina, gave Cazares a black Honda Accord with a hidden compartment for Cazares to use to store drugs and proceeds.  Cazares knew Appellant Vega from home construction jobs and asked Vega to help him deliver Primo's drugs and drug proceeds.  Vega agreed and began transporting the methamphetamine and proceeds, sometimes with Cazares and sometimes on his own.  After Cazares was arrested, Cazares agreed to make a recorded telephone call to Vega during which Vega recognized "Primo," mentioned "cooking" the methamphetamine, and offered to help Cazares move multiple kilograms of methamphetamine that were hidden in Cazares's ex-wife's house.  When Vega was arrested, Vega admitted to Agent Mata that he was a runner for Cazares and knew there were multiple kilograms of methamphetamine in

---

[1] We view the evidence in the light most favorable to the jury verdict as it relates to the sufficiency-of-the-evidence challenges.  *See United States v. Moreland,* 665 F.3d 137, 148 (5th Cir. 2011) ("[J]udges must be highly deferential to the jury's verdict of conviction: courts view the evidence in the light most favorable to the prosecution." (internal quotation marks and alterations omitted)).

No. 14-40654

Cazares's ex-wife's house. Investigators found the black Honda Accord with the hidden compartment at Vega's apartment. A key to the Honda was hidden inside one of Vega's home speakers.

During the time of the alleged conspiracy, Manuel Camacho sold methamphetamine to Appellant Salazar who distributed it in the Denison/Sherman area. The Camachos also sold methamphetamine to Kenneth House, who at first competed with Salazar in the Denison/Sherman area, but later became Salazar's partner in distributing methamphetamine there. From about 2010 to 2011, House and Salazar also purchased methamphetamine from another source in Dallas named Fernando Perales. House's wife, Christina, would go with House to pick up drugs from Perales. Perales knew House was distributing the methamphetamine with Salazar in the Sherman/Denison area.

An individual named Trey Tibbs purchased methamphetamine from House and Salazar in 2010 and 2011. Tibbs also worked for House and Salazar by picking up drug proceeds and delivering methamphetamine for them. When House went to jail, Tibbs purchased methamphetamine from Salazar. After Salazar also went to jail, an individual named Charles Quirolo continued the Salazar/House methamphetamine distribution operation until customers complained about Quirolo, after which Salazar's girlfriend, Andrea Reeves, took over the operation.

House testified that Salazar sold methamphetamine to both Appellant Bowen and his brother, Melvin, and that Salazar would "front" methamphetamine to them when they did not have enough money to pay Salazar. After Melvin went to jail and still owed Salazar money, Melvin's wife, Kisha, started working for Salazar to pay off her husband's debt. After the debt was paid, Kisha continued distributing methamphetamine for Salazar.

3

No. 14-40654

While House and Melvin were in jail, their wives (Christina House and Kisha Bowen[2]) met and became friends. Christina introduced Kisha to Perales, who had supplied methamphetamine to House and Salazar.

After House went to jail, Christina House bought methamphetamine from Perales. Christina and Kisha pooled their money together to buy methamphetamine at a better price from Perales. One of Kisha's customers was Bowen, who gave her money to purchase methamphetamine for him from Perales. Eventually, Kisha and Christina introduced Bowen to Perales because Bowen had "a lot" of customers and was having trouble getting his supply from Salazar's agents.

Perales testified that he sold two to four ounces of methamphetamine to Kisha and Bowen per week. Perales testified that after Kisha stopped participating, Bowen continued to buy methamphetamine from Perales, and eventually brought Tibbs with him. Bowen and Tibbs pooled their money to buy methamphetamine from Perales. According to Perales, Tibbs and Bowen eventually purchased around ten ounces per week from him. Perales testified that he knew Tibbs and Bowen were distributing methamphetamine in Sherman.

Marie Davila testified that she purchased methamphetamine from Bowen and that beginning in summer 2011, she was paid by Bowen to drive him to pick up drugs from Perales. She testified that Bowen paid her $100 cash and a gram of methamphetamine for each trip. Carlos Cabrales, who lived with Davila, testified that he was paid to supply Davila with a car to drive Bowen and also to rent cars for them so that Bowen could pick up drugs in a variety of cars.

---

[2] Kisha Bowen is Appellant Bowen's sister-in-law. All references to "Bowen" in this opinion are to Appellant Timothy Bowen.

4

No. 14-40654

Davila testified that Bowen purchased "two sandwich bags" half-full of methamphetamine about every two days from Perales until about mid-October 2011. Davila testified that in the approximately three-month period during which Davila drove Bowen, they made eighteen to twenty trips to buy drugs from Perales. Davila testified that she also helped Bowen package the methamphetamine for redistribution to Bowen's customers and would rent hotel rooms, which Bowen paid for, where she and Bowen would package the drugs.

In sum, the evidence at trial demonstrated that Primo sent methamphetamine from Mexico via Cazares and Vega, who delivered the drugs to Nguyen in Dallas. Nguyen sold the methamphetamine to the Camacho siblings in Dallas. The Camacho siblings sold methamphetamine to Salazar and his partner House. Salazar and House also bought their methamphetamine from Perales in Dallas, and once Salazar and House went to jail, some of their customers also bought methamphetamine from Perales. Salazar, House, and some of their customers distributed the methamphetamine in the Sherman/Denison area. Bowen purchased methamphetamine from Salazar and, once Salazar went to jail, from Perales (first through Kisha Bowen and Christian House, then directly from Perales, sometimes pooling his money with Tibbs to get a better deal from Perales), and sold that methamphetamine to customers in the Sherman area.

When the government rested after the presentation of the evidence, Appellants moved for acquittal. After hearing argument from each Appellant's counsel, the district court denied the three motions for acquittal. Appellants then waived their right to testify, and defense counsel rested. Appellants requested a multiple conspiracies instruction, which the district court denied. The jury found all three Appellants guilty of the charged crime. Vega and

Bowen were sentenced to 324 months of imprisonment, and Salazar was sentenced to life imprisonment.

All three Appellants appeal their convictions, and Bowen appeals his sentence as well. Regarding the challenges to the convictions, Bowen and Vega argue that the evidence was insufficient to support their convictions; Salazar and Bowen argue that the district court abused its discretion by refusing to give the jury a multiple-conspiracies instruction; and Salazar argues that a statement made by the prosecutor in closing argument was reversible error. Regarding Bowen's challenge to his sentence, Bowen argues that the district court impermissibly granted a three-level enhancement for Bowen's role as a manager/supervisor in the conspiracy and that the district court impermissibly calculated his base offense level using the conspiracy-wide drug quantity, rather than a drug amount for which Bowen was individually responsible.

## II.

## A.

Vega and Bowen argue that the government's evidence was insufficient to support their convictions. Because Vega and Bowen made timely motions for acquittal at trial, we review *de novo* their challenge to the sufficiency of the evidence supporting their convictions. *United States v. Beacham*, 774 F.3d 267, 272 (5th Cir. 2014). The review, though *de novo*, is nevertheless "highly deferential to the verdict." *Id.* "The jury's verdict will be affirmed unless no rational jury, viewing the evidence in the light most favorable to the prosecution, could have found the essential elements of the offense to be satisfied beyond a reasonable doubt." *United States v. Roetcisoender*, 792 F.3d 547, 550 (5th Cir. 2015). While we consider evidence that countervails the jury's verdict, all reasonable inferences are made in favor of the jury's verdict. *Id.*

To prove a drug conspiracy, the government must prove that "(1) two or more persons, directly or indirectly, reached an agreement to possess with the intent to distribute a controlled substance; (2) [the defendant] knew of the agreement; (3) [the defendant] voluntarily participated in the agreement; and (4) the overall scope of the conspiracy involved [the drug amount in the charged crime]." *United States v. Castillo-Chavez*, 555 F. App'x 389, 398–99 (5th Cir. 2014) (citing *United States v. Jimenez*, 509 F.3d 682, 689 (5th Cir. 2007)); 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846), *cert. denied*, 135 S. Ct. 161 (2015). "A reasonable jury may 'infer the existence of a conspiracy from the presence, association, and concerted action of the defendant with others.'" *Id.* (quoting *United States v. Curtis*, 635 F.3d 704, 719 (5th Cir. 2011)).

Vega argues that the evidence against him was "solely based on the co-defendant testimony of one witness, Mr. Ramiro Cazares." Vega acknowledges that a co-conspirator's uncorroborated testimony can support a guilty verdict—even if the co-conspirator has accepted a plea bargain—unless the testimony is "incredible." *See United States v. Villegas-Rodriguez*, 171 F.3d 224, 228 (5th Cir. 1999). Vega argues that Cazares's testimony is incredible because Cazares admitted to being a deceptive person and had a motive to testify against Vega for the possibility of a reduced sentence.

"Testimony is incredible as a matter of law only if it relates to facts that the witnesses could not possibly have observed or to events which could not have occurred under the laws of nature." *United States v. Valdez*, 453 F.3d 252, 257 (5th 2006). Neither Cazares's admission to having deceived someone in the past nor his possible motive to testify against Vega render Cazares's testimony "incredible." *See id.* The jurors were adequately informed about these matters, and we do not review the weight or credibility of the evidence, including witness testimony. *United States v. Hayes*, 342 F.3d 385, 389 (5th

No. 14-40654

Cir. 2003). Instead, we view the evidence "in the light most favorable to the verdict, accepting all credibility choices and reasonable inferences made by the trier of fact which tend to support the verdict." *United States v. Moreno-Gonzalez*, 662 F.3d 369, 372 (5th Cir. 2011).

Moreover, the premise of Vega's argument is simply incorrect. The evidence against Vega was not "solely based" on Cazares's testimony—Agent Mata also testified against Vega. Agent Mata corroborated Cazares's testimony by testifying about physical evidence, including evidence that linked Vega to the crime, and about Vega's incriminating statements made to Agent Mata after Vega's arrest. For example, Agent Mata testified that during surveillance of Vega's apartment in Dallas, they observed Vega driving the black Honda Accord with the hidden compartments that, according to trial testimony, one of Nguyen's agents gave to Cazares for drug runs.[3] Agent Mata also testified that after arresting Vega, Vega told him that Cazares's source was "Primo"; admitted to being a "runner" for Cazares; stated that there were multiple kilograms of methamphetamine in a basket upstairs in Cazares's ex-wife's house in Grand Prairie—precisely where agents had just previously recovered multiple kilograms of methamphetamine; stated that he knew the Black Honda had a hidden compartment and that Cazares had loaned the car to him; and, after denying that he had the keys to the Honda, eventually admitted that the keys were hidden inside a speaker box in his apartment, which was were agents found the keys. Vega also told Agent Mata that he had had a cell phone, but he had thrown it on the side of the road after hearing that Cazares had been arrested.

---

[3] Specifically, Manuel Urbina testified that he worked for Nguyen in the methamphetamine distribution scheme and had worked with Cazares to transport drugs and drug proceeds. Urbina testified that he delivered the Honda Accord with the hidden compartments to Cazares at the direction of Nguyen. Nguyen testified that he bought the Honda Accord and put a drug stash box in it that was accessed via a trapdoor.

The jury also heard a recorded phone call between Vega and Cazares that corroborated Cazares's testimony. According to Cazares, he and Vega had transported six kilograms of methamphetamine to Cazares's house and had set up a lab to make "ice" by "cooking" the methamphetamine.[4] During the phone call, Vega referred to the "cooking" and offered to "do the cooking" that day. Cazares told Vega that he was still waiting to hear from Primo, and Vega indicated that he knew about Primo and knew Primo was in charge. Cazares also told Vega that he wanted to get the "balls" out of the house, and Vega responded by offering to help Cazares find a place to "store it for good."

This evidence was sufficient to show that Vega knew about the methamphetamine distribution scheme and voluntarily agreed to act in furtherance of that scheme. *See Jimenez*, 509 F.3d at 689. As far as Vega's connection to the conspiracy as a whole, various witnesses testified to Cazares's connections to Primo and Nguyen, and to Primo and Nguyen's connections to the Camacho siblings, who supplied methamphetamine to Salazar, who sold methamphetamine in the Sherman/Denison area, including to Bowen who distributed methamphetamine to his own customers in the Sherman/Denison area. Finally, the testimony of multiple witnesses established that the conspiracy easily involved the charged quantity of methamphetamine.[5] The evidence was easily sufficient to support Vega's conviction.

---

[4] Agent Mata testified that "cooking" is the term for converting powder methamphetamine to crystal methamphetamine.

[5] Andy Nguyen testified that he sold the Camacho siblings around twenty to thirty kilograms of methamphetamine. Manuel Camacho testified that he delivered to House on a single occasion two pounds of methamphetamine, which equates to over 900 grams. Manuel Camacho estimated that, in all, from mid-2010 to when he was arrested in 2012, he sold roughly 43.5 pounds (19,731.27 grams) to Salazar and House. Manuel Camacho testified that all of that methamphetamine was distributed in the Sherman/Denison area.

Turning to Bowen's sufficiency argument, Bowen argues that the evidence against him did not show he was a member of the methamphetamine distribution conspiracy because there was no evidence that Bowen "entered into an agreement with anyone to distribute methamphetamine." Bowen argues that he acted "independently" of the other co-conspirators because he "did not depend on anyone other than himself." Bowen also argues that the evidence against him was based solely on the testimony of cooperating witnesses and their testimony was "wholly unbelievable or [un]reliable" or "incredible as a matter of law" because the witnesses' testimony was inconsistent as to the dates when Bowen allegedly met Perales and Salazar to purchase methamphetamine, as some witnesses said June 2011, while others said September 2011.

An express agreement is not required to prove a conspiracy: "It is well-settled that circumstantial evidence may establish the existence of a conspiracy, as well as an individual's voluntary participation in it," and a "jury is free to infer the existence of a conspiracy from the presence, association, and concerted action of the defendant with others." *Curtis*, 635 F.3d at 719 (internal quotation marks and alterations omitted). The evidence showed many instances in which Bowen depended on other co-conspirators, such as his buying methamphetamine from Salazar and Perales, giving Kisha Bowen and Christina House money to buy methamphetamine for him from Perales, and pooling his money with Tibbs to get a better deal on methamphetamine from Perales. Finally, discrepancies in witness testimony go to the weight and credibility of the evidence, which we do not review. *Moreno-Gonzalez*, 662 F.3d at 372 ("[A]ny conflict in the evidence must be resolved in favor of the jury's verdict.").

The evidence was more than sufficient to show that Bowen knew about the methamphetamine distribution scheme and voluntarily took part in the scheme: multiple witnesses testified that Bowen cooperated with many of the alleged co-conspirators—including Perales, Salazar, Kisha Bowen, Christina House, and Tibbs—to buy and distribute methamphetamine in the Sherman/Denison area.  For example, Bowen bought methamphetamine from Salazar until Salazar went to jail, after which he gave money to Kisha Bowen and Christina House to buy methamphetamine for him from Perales, to whom Bowen was eventually introduced because Bowen needed a good source to supply his customers in the Sherman/Denison area.  Marie Davila testified that Bowen sold drugs to her and later paid her to drive him to buy drugs from Perales after which Davila helped Bowen package the methamphetamine for redistribution in the Sherman/Denison area.  Tibbs testified that Bowen pooled his money with him so that they could get a better deal on methamphetamine from Perales.  Accordingly, Bowen's sufficiency challenge also fails.[6]

## B.

Salazar and Bowen argue that their convictions must be reversed because the trial court failed to give a multiple conspiracies jury instruction.  Where, as here, the defense requested a jury instruction and the request was denied, we review the denial for abuse of discretion.  *United States v. McClatchy,* 249 F.3d 348, 356 (5th Cir. 2001).  The court affords "substantial latitude to the district court in describing the law to the jury."  *United States v. Barnes*, 803 F.3d 209, 222 (5th Cir. 2015).

A multiple conspiracies instruction "is generally required where the indictment charges several defendants with one . . . overall conspiracy, but the

---

[6] As discussed above, the charged conspiracy-wide quantity was established by witness testimony.  *See supra* note 5.

proof at trial indicates that some of the defendants were o*nly* involved in separate conspiracies *unrelated* to the overall conspiracy charged in the indictment." *United States v. Castaneda-Cantu*, 20 F.3d 1325, 1333 (5th Cir. 1994) (second emphasis added). Salazar and Bowen argue that Bowen was in only a separate conspiracy unrelated to the drug dealing activities of Salazar and other co-conspirators because Bowen acted "independently" of the other conspirators.

Ordinarily, district courts should give a multiple conspiracies instruction if there is some evidence that could support a reasonable jury's finding that the defendant was in only an unrelated conspiracy. The government argues that here there is no such evidence that Bowen was in only an unrelated conspiracy. Assuming, *arguendo*, that there was such evidence, any error was harmless because: (1) the jury was given a detailed conspiracy instruction requiring them to find that Bowen was a member of the charged conspiracy; (2) Bowen's counsel was free to, and did, argue that Bowen was not part of the charged conspiracy; and (3) the evidence against Bowen was overwhelming.[7] *See*

---

[7] In *United States v. Erwin*, 793 F.2d 656, 663 (5th Cir. 1986), we reversed a district court's refusal to give a multiple conspiracy instruction without expressly analyzing whether substantial prejudice required reversal. Our earlier case law indicates that a prejudice analysis is required for reversal. *See, e.g.*, *United States v. LeCompte*, 599 F.2d 81, 82 (5th Cir. 1979) (holding that the trial court did not err by failing to instruct on multiple conspiracies when the refusal did not prejudice the defendants). And our "later caselaw has effectively by-passed" that omission in *Erwin*. *United States v. Frame*, 236 F. App'x 15, 18 (5th Cir. 2007); *see, e.g.*, *United States v. Johnson*, 68 F.3d 899, 904 (5th Cir. 1995) (requiring defendant-appellant to show that the refusal to give a multiple conspiracies instruction "seriously impaired the defendant's ability to present a given defense" and affirming the district court because "[t]he charge given by the trial court adequately instructed the jury that it could not convict [the defendant] unless the government proved beyond a reasonable doubt that the defendant knowingly joined in the *conspiracy described in the indictment*" and because appellant's "defense could not have been seriously impaired by the district court's refusal to give the proposed charge"); *United States v. Segura*, 122 F. App'x 768, 780 (5th Cir. 2005) (requiring a prejudice analysis when determining whether the trial court erred for failure to instruct the jury on multiple conspiracies defense); *cf. United States v. Saldivar*, 48 F.3d 530, at *1 (5th Cir. 1995) (unpub.) (stating in the context of an alleged variance between

*McClatchy,* 249 F.3d at 356 (stating that we will not reverse a refusal to give a jury instruction if the refusal did not "seriously impair[] the defendant's ability to present a defense"); *United States v. Villafranca,* 260 F.3d 374, 380 (5th Cir. 2001) (holding that failure to give jury instruction was harmless where evidence of guilt is overwhelming).

## C.

Salazar also argues that his conviction should be reversed because one of the prosecutor's statements during closing argument constituted improper vouching for the credibility of government witnesses who had testified pursuant to plea agreements. "The test for improper vouching for the credibility of a witness is 'whether the prosecutor's expression might reasonably lead the jury to believe that there is other evidence, unknown or unavailable to the jury, on which the prosecutor was convinced of the accused's guilt.'" *United States v. McCann,* 613 F.3d 486, 495 (5th Cir. 2010) (quoting *United States v. Ellis,* 547 F.2d 863, 869 (5th Cir. 1977)). Salazar contends that the italicized portion of the following statement during the prosecutor's rebuttal argument constituted improper bolstering of government witness testimony and was unsupported by any evidence at trial:

> . . . [W]hen you are considering the testimony of a person who comes into this courtroom, who did you think was gonna come in here and testify? . . . Not choirboys, not preachers. It's gonna be the people that are involved. And that's who we brought you. Now, you have to decide whether they're credible or not; you have to decide whether you believe them or not.

---

indictment and proof regarding a single or multiple conspiracy that "[a] variance between the indictment and proof is not fatal unless it prejudiced the defendant's substantial rights").

Here, the jury was given a detailed instruction on conspiracy, and Bowen's defense counsel argued a multiple conspiracies theory to the jury. Bowen was not substantially prejudiced by the trial court's failure to give a multiple conspiracies instruction. *See Johnson,* 68 F.3d at 904; *Ary-Berry,* 424 F. App'x at 351 (citing *United States v. Storm,* 36 F.3d 1289, 1294 (5th Cir. 1994)).

And we did go over the plea agreements ad nauseam.  And we do that because we want you to see the restrictions and conditions that they're under when they testify.  We want you to see that if they lie, there are consequences.

*And how are we going to know that they're lying to us? We're gonna know that because the people that testify that are giving us information, they don't know what we know.  They don't know who we've talked to.  So if we're talking to individuals and they differ between one another, and we're telling them, "You have to be 100 percent honest," and we've heard different stories from those people, then they're gonna be called to task for it.  Because they're being interviewed at separate times, and the information that the agent has developed through his investigation that he knows, and the information that he has developed by debriefing other people, not only the one that's giving the information, that he knows is going to be used as a barometer to tell us whether that person is telling us the truth or not.* . . . [Y]ou saw the conditions that are in the plea agreement, that if they don't testify, other charges can be filed against them, obstruction of justice, perjury, and that would be stacked on top of the time that they're already looking at.  So ask yourself: If the goal is to do less time, if the goal is to be with your infant child, then it makes no sense for them to come in here and lie to you, where they would be exposed to more time. . . .

So, yes, there has to be some incentive for them to come in here and testify, because nobody wants to come in here and testify and point someone out and say, 'that's the guy that was selling to me.' . . . No one wants to do that. . . .

So is there any guarantees or promises made to them? No.

Is there a hope that they may receive something?  Yes.

And they all said that repeatedly.  That's the information that you have, ladies and gentlemen, to judge their credibility.  We didn't hide their addictions, we didn't hide their criminal history, because we want you to take all of that into consideration.  But mostly what we want you to do is for you to take their testimony, compare it to another person's testimony that came into this courtroom, and see that their testimony matches.

Salazar notes, quoting our decision in *United States v. Gracia*, that a prosecutor "may not make a personal assertion regarding a government witness's credibility, cloaking the witness in the Government's 'protective mantle.'" 522 F.3d 597, 600–01 (5th Cir. 2008). Salazar argues that because the entirety of the evidence against him was based on the testimony of government witnesses, the prosecutor's statement—assuring the jury that the government witnesses were truthful because their testimony had been compared with other informants' statements—was an improper bolstering of witness testimony that casts serious doubt on the jury's verdict.

As we have repeatedly observed, "[a] prosecutor is confined in closing argument to discussing properly admitted evidence and any reasonable inferences or conclusions that can be drawn from that evidence." *United States v. Ceballos*, 789 F.3d 607, 624 (5th Cir. 2015) (quoting *United States v. Reagan*, 725 F.3d 471, 492 (5th Cir. 2013)). "We have repeatedly chastised federal prosecutors for making improper remarks in closing arguments—for example, for 'bolstering' federal agents' credibility in closing arguments, for attacking the character of the defendant, and for attacking the character of defense counsel." *United States v. Rodriguez-Lopez*, 756 F.3d 422, 433–34 (5th Cir. 2014) (citing *United States v. Aguilar*, 645 F.3d 319, 324 (5th Cir. 2011); *United States v. Jefferson*, 432 F. App'x 382, 390 (5th Cir. 2011); *United States v. Murrah*, 888 F.2d 24, 27 (5th Cir. 1989)). In particular, "[e]xcept to the extent the prosecutor bases any opinion on the evidence in the case, he may not express his personal opinion on the merits of the case or the credibility of witnesses." *Ceballos*, 789 F.3d at 624 (quoting *United States v. Alaniz*, 726 F.3d 586, 616 (5th Cir. 2013)).

The prosecutor's closing argument in this case constituted improper vouching. The prosecutor argued in closing that government witnesses should

be credited because they would be "called to task" pursuant to their plea agreements for any dishonesty—dishonesty which the government was positioned to identify based on "the information that the agent has developed through his investigation that he knows, and the information he has developed by debriefing other people." That comment "might reasonably lead the jury to believe that there is other evidence, unknown or unavailable to the jury," on which the prosecutor was basing his argument as to the witnesses' credibility. *See McCann*, 613 F.3d at 495. We are not persuaded by the government's response that the challenged statement was a permissible rebuttal to Bowen's closing argument, in which Bowen's attorney argued that the government would have no way of knowing whether witnesses were lying so as to enforce those witnesses' plea agreements. While we have sometimes permitted bolstering arguments that specifically respond to attacks on witness credibility, such arguments must draw only on evidence before the jury. *See id.* at 495–96. Here, the jury was not exposed to "the information that the agent ha[d] developed through his investigation," and the prosecutor's credibility argument based on that information was consequently improper.

Although the challenged statement was improper, it did not "cast serious doubt on the correctness of the jury's verdict." *United States v. Anderson*, 755 F.3d 782, 797 (5th Cir. 2014). The conviction was supported by overwhelming evidence of Salazar's guilt. *See id.* at 798–99; *Rodriguez-Lopez*, 756 F.3d at 434. Nearly every witness throughout the seven-day trial, including several who had not entered into plea agreements with the government, testified to Salazar's significant involvement in the methamphetamine distribution conspiracy. Salazar is not entitled to a new trial based on the prosecutor's improper closing argument.

**D.**

Bowen argues that his sentence should be vacated because the district court improperly granted a three-level enhancement for Bowen's role as a manager/supervisor in the conspiracy when the evidence did not support the enhancement.

We review the district court's interpretation and application of the sentencing guidelines *de novo* and its findings of fact for clear error. *Roetcisoender*, 792 F.3d at 550. When determining whether an enhancement applies, "a district court is permitted to draw reasonable inferences from the facts, and these inferences are fact-findings reviewed for clear error as well." *United States v. Pillault*, 783 F.3d 282, 286–87 (5th Cir. 2015). The district court's factual finding "is not clearly erroneous if it is plausible in light of the record read as a whole," or, put another way, a district court's factual findings will be held clearly erroneous "only if, based 'on the entire evidence,' we are 'left with the definite and firm conviction that a mistake has been committed.'" *Id.*

Under § 3B1.1(b) of the U.S. Sentencing Guidelines, a defendant's base offense level should be increased by three levels if the defendant "was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b). The Guidelines do not define "manager" or "supervisor," but the commentary notes state that the defendant "must have been . . . the manager, or supervisor of one or more other participants." *United States v. Nava*, 624 F.3d 226, 229 (5th Cir. 2010) (citing § 3B1.1 cmt. n.2 (2009)). Bowen argues that the district court's finding that he was a manager/supervisor in the conspiracy was clearly erroneous because there was no evidence that Bowen forced Davila or Cabrelas to work for him. Bowen also argues that

because Davila and Cabrelas never sold drugs or collected drug money for him, Bowen cannot be considered a manager/supervisor.

At sentencing, the district court found that the evidence at trial showed that Bowen was hiring individuals to drive him to pick up drugs, to rent cars for those pick-ups, and to rent hotel rooms where the drugs would be packaged for distribution, and that such evidence supported a finding that Bowen acted in a managerial role in the conspiracy. We agree. Accordingly, it was not error for the district court to enhance Bowen's offense level for his role as a manager/supervisor.[8]

### III.

Because we find no reversible error in Appellants' convictions or Bowen's sentence, we AFFIRM.

---

[8] In a 28(j) letter filed after the completion of briefing, Bowen also argued for the first time that in light of our recently published decision in *United States v. Haines*, 803 F.3d 713 (5th Cir. 2015), his sentence should be vacated because the district court based its Guidelines calculation on the drug quantity attributable to the conspiracy as a whole rather than to him individually. We have made clear that any issue not raised in an appellant's opening brief is forfeited. *See United States v. Delgado*, 672 F.3d 320, 348–49 (5th Cir. 2012). Moreover, *Haines* is inapposite because in it "[w]e simply [held] that, for purposes of statutory minimums at sentencing, the relevant quantity is the quantity attributable to the individual defendant," *Haines*, 803 F.3d at 742, whereas here, Bowen does not challenge the calculation of his mandatory minimum sentence but rather his offense level under the Guidelines.